**UNITED STATES of America, and James L. Sherlock, Special Agent of the Internal Revenue Service, Petitioners,**

v.

**MILLSTONE ENTERPRISES, INC., R & R Trucking and Transportation, Inc., Vee's Book Boutique, Inc., Truckers Training and Transfer, Inc., Businessman's Management and Consulting Company, Inc., Boulevard Bookstore, Inc., Respondents.**

Civ. A. No. 87–2406.

United States District Court,
W.D. Pennsylvania.

April 18, 1988.

Amy Reynolds Hay, Asst. U.S. Atty., Pittsburgh, Pa., Stuart D. Gibson, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for petitioners.

Thomas A. Crawford, Pittsburgh, Pa., for respondents.

## MEMORANDUM OPINION

MENCER, District Judge.

### Procedural Background

This is an action by the United States of America and a Special Agent of the Internal Revenue Service's [IRS] Criminal Investigation Division, James L. Sherlock [collectively "the Government"] to enforce a summons issued to the respondents. The respondents are six corporations controlled by William Robert Birdseye. Birdseye is currently being prosecuted, along with his son William Richard Birdseye, by Allegheny County, Pennsylvania, authorities on criminal charges related to prostitution and pornography.

Special Agent Sherlock is conducting a IRS criminal investigation to determine whether William Robert Birdseye committed criminal offenses with regard to his income taxes for the years 1982 to 1985. On March 20, 1987, Sherlock issued a summons seeking production of the corporate books and records of the six corporations who are the respondents in this action. The summons also directed Birdseye, as president of the respondent corporations, to answer questions put to him by Sherlock. William Robert Birdseye and the respondents have refused to comply with the summons, claiming that the criminal tax investigation, the summons and Special Agent Sherlock's questions for Birdseye are derived from an illegal wiretap. This Court held a hearing at which the respondents were to show cause why they should not comply with the IRS summons. We issued an order on January 7, 1988 directing the respondents to comply with the summons. When the respondents maintained their refusal to comply with the summons, this Court held a civil contempt hearing on April 5–6, 1988. We must now decide whether the respondents should be held in contempt of this court's order, or whether they had "just cause" to refuse compliance.

### Facts

On April 21, 1986, Pennsylvania Superior Court Judge Zoran Popovich authorized the Pennsylvania State Police and Westmoreland County law enforcement officials to wiretap three Birdseye telephones. Pen register devices had already been monitor-

ing these telephones, authorized by a Pennsylvania Court of Common Pleas Judge in January 31, 1986. Pennsylvania Superior Court Judge Zoran Popovich's April 21, 1986 wiretap authorization was founded on a finding of probable cause that William Robert Birdseye was violating: Title 18 Pa.C.S. § 5902 (engaging in prostitution and related offenses); Title 18 Pa.C.S. § 911 (Corrupt Organizations statute, engaging in a pattern of racketeering activity within the meaning and purview of the statute), and; Title 18 Pa.C.S. § 903 (conspiracy to violate the preceding sections).

Evidence acquired through wiretapping formed the basis of probable cause for search warrants for a series of raids on the Birdseye residence and businesses conducted by state and local law enforcement officials beginning in May, 1986 and ending July 18, 1986. An IRS Special Agent, Robert R. Clark, took part in the July 18, 1986 raid of the Birdseye residence, at which the authorities examined and seized financial records, a computer and computer discs.

The IRS's criminal tax investigation of William Robert Birdseye was officially begun by Special Agent Sherlock nearly three months later, when a case number was assigned on October 10, 1986. Special Agent Sherlock testified that a case is "numbered" when the IRS has an indication that there has been a violation of a tax law. Sherlock's initial involvement in the Birdseye investigation was when he was invited by Westmoreland County law enforcement officials to review documents that had been seized in the raids on the respondent corporations' premises and the Birdseye residence. Sherlock testified that in late July or early August, 1986, he visited a Pennsylvania State Police barracks where he reviewed most, but not all, of the material seized by the state and local authorities. He photocopied certain of the seized records at that time. Sherlock requested copies of William Robert Birdseye's personal income tax returns from the IRS files on August 8, 1986. He did not request tax returns for the respondent corporations until some later date.

While the IRS did not begin its case investigating William Robert Birdseye until October 10, 1986, several IRS Criminal Division agents had previously acquired isolated snippets of information on Birdseye. Special Agent Sherlock testified that prior to November, 1985, IRS Criminal Division Agents Gary McCoffskey and James Blum learned, through a different investigation, that Birdseye allegedly had supplied go-go girls to a bar. In November, 1985, Westmoreland County detectives informed Agent Blum that Birdseye was alleged to be involved in prostitution. Blum filed a report on this information, but made no mention of possible tax violations. He did not request copies of Mr. Birdseye's tax returns, and did not initiate a criminal tax investigation.

In late December, 1985 or early January, 1986, IRS Agent Robert Clark was contacted by a Pennsylvania State Trooper who told him of a state investigation into Mr. Birdseye for pornography. Clark asked the trooper to keep him informed of developments in the state investigation. State authorities later invited Clark to participate in the July 18, 1986 search of the Birdseye residence, and he was part of the search team that day. Clark testified that while he had examined some of the records seized during the raid, he made no photocopies. He also testified that to the present day he has no knowledge of Millstone Enterprises, Inc. or any of the other respondent corporations. After the raid, Clark made a verbal report to his supervisor but took no further action.

Special Agent Sherlock was dispatched to the state police barracks soon thereafter to review the seized documents and he later opened up the criminal investigation of William Robert Birdseye. On March 20, 1987, Birdseye was served with a summons directing him to appear before Special Agent Sherlock on April 6, 1987 to give testimony and to bring with him essentially all the financial records of each of the respondent corporations. The respondents' refusal to comply with that summons has ultimately lead to this contempt hearing.

## Discussion

### I. Civil Contempt Standard

28 U.S.C. § 1826(a) provides that a judge may order confinement "[w]henever a witness in any proceeding before or ancillary to any court ... of the United States refuses *without just cause* to comply with an order of the court to testify or provide information...." 28 U.S.C. § 1826(a). Therefore, "just cause" for a refusal to comply with a court order is a defense to being held in contempt.

In this case, the respondents maintain they have "just cause" not to comply with this Court's January 7, 1988 order directing them to comply with Special Agent Sherlock's summons directing William Robert Birdseye to appear for questioning and to produce corporate records. The respondents claim "just cause" because the IRS's criminal investigation of Birdseye, the summons and the questions to be put to him by Sherlock were derived from wiretaps which violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.* [Title III].

### II. The State Wiretaps Violated The Federal Wiretapping Statute

In Title III, Congress set out a comprehensive scheme for the regulation of wiretapping and electronic surveillance. 18 U.S.C. §§ 2510 *et seq.* Title III authorizes the interception of private wire and oral communications only when federal, state or local law enforcement officials are investigating certain specified crimes and receive prior judicial authorization. 18 U.S.C. § 2516. "Except as expressly authorized in Title III ... all interceptions of wire and oral communications are flatly prohibited." *Gelbard v. United States,* 408 U.S. 41, 47, 92 S.Ct. 2357, 2360, 33 L.Ed.2d 179 (1972). Title III makes it a crime to engage in illegal interception or to disclose information obtained through illegal interceptions. 18 U.S.C. § 2511(1). The victim of an illegal interception, disclosure or use is entitled to recover civil damages. 18 U.S.C. § 2520. Title III also bars the use of the contents of illegally intercepted communications, as well as evidence derived there-

from ("fruit of the poison tree") "in any trial hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee or other authority of the United States, a State, or a political subdivision thereof ..." 18 U.S.C. § 2515. The statute also provides procedures for moving to suppress such evidence in various proceedings. 18 U.S.C. § 2518(9)–(10).

### A. States May Not Wiretap To Investigate Non–Violent Prostitution–Related Allegations

■ The respondents contend that the wiretaps authorized by Judge Zoran Popovich on April 21, 1986 were illegal because they were approved for the investigation of crimes not within the scope permitted by 18 U.S.C. § 2516(2). Section 2516(2) enumerates the offenses whose investigation may be pursued through the interception of wire, oral or electronic communications. It permits a state to wiretap for the investigation of:

murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, *or other crimes dangerous to life, limb or property,* and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.

18 U.S.C. § 2516(2) [emphasis added]. The respondents contend that the state crimes for which the wiretaps were approved to investigate are not offenses within the scope of section 2516(2). They argue that the wiretap was therefore invalid, and any evidence derived therefrom should not be used in a proceeding before a government body. We agree.

The wiretap authorized on April 21, 1986 was for the investigation of prostitution and related offenses (18 Pa.C.S. § 5902), corrupt organizations (18 Pa.C.S. § 911) and conspiracy with regard to the former offenses (18 Pa.C.S. § 903). None of these crimes are among those specified in section 2516(2). The question remains whether

these offenses might have been within the Congress's intendment of "other crimes dangerous to life, limb or property."

The legislative history of section 2516(2) indicates that Congress did not intend to authorize state wiretapping for offenses such as prostitution. The drafters of section 2516(2) explained that the list of crimes was to represent a class of major offenses that were either "intrinsically serious or * * * [were] characteristic of the operations of organized crime." Senate Report No. 1097, 90th Cong., 2d Sess., U.S. Code Cong. & Admin. News, 1968, pp. 2112, 2234. With the exception of bribery and gambling, these enumerated crimes all involve harm or the substantial threat of harm to the person, a "limitation [expressly] intended to exclude such offenses as fornication and adultery" from the permissable scope of electronic surveillance. *Id.* at p. 2187; *see People v. Shapiro*, 50 N.Y.2d 747, 764, 431 N.Y.S.2d 422, 432, 409 N.E.2d 897, 907 (1980). Prostitution was not within Congress's intention of "other crimes dangerous to life, limb or property," particularly where, as here, there has been no allegations of associated violence or threat of violence.

▪ The Government argues that the Pennsylvania legislature has made findings of fact, stated in the corrupt organizations statute, 18 Pa.C.S. § 911, that it considers prostitution to be a crime dangerous to life or limb. It draws this conclusion because the Pennsylvania legislature included prostitution as a "racketeering activity" within the corrupt organizations statute, *see* 18 Pa.C.S. § 911(h)(1)(i) [listing as a racketeering activity "Chapter 59 (relating to public decency)"], and the legislature has made the finding that organized crime operates through illegal use of violence, force and intimidation.[1] Furthermore, the Government argues, Pennsylvania's wiretap statute permits wiretapping for investigations of violations of the corrupt organizations statute, 18 Pa.C.S. § 5708(a)(5), thereby demonstrating the legislature's concern for the seriousness of that offense.

We cannot agree that by including prostitution among its listing of "racketeering activities" the Pennsylvania legislature can thereby transform prostitution into a crime dangerous to life or limb. While prostitution might be conduct which often may lead to violence, it is not in and of itself dangerous to life or limb. In fact, the Pennsylvania wiretap statute permits interception of wire or oral communications for investigation of violations of the prostitution statute *only* "where such offense is dangerous to life, limb or property ..." 18 Pa.C.S. § 5708(a)(2). This evidences an awareness on the part of the Pennsylvania legislature that not all prostitution crimes involve violence or physical danger. We do not think that an alleged corrupt organizations violation, where a non-violent prostitution-related offense is the underlying "racketeering activity," may be permitted to bootstrap prostitution-related conduct into the category of crimes dangerous to life or limb.

The Government has not challenged the fact that the federal wiretapping statute preempts state wiretapping provisions. However, the federal statute's grant of enabling power to the states in section 2516 makes it clear that Congress did not intend to supercede state regulation of these matters entirely. The statute recognizes that a state is free to either adopt procedures and standards more restrictive than those of the federal statute or, if it desires, to prohibit wiretapping within its borders altogether. 18 U.S.C. § 2516(2). However, any state law drawn more broadly than the federal statute runs afoul of the supremacy clause. U.S. Const. art. VI, cl. 2; *see*

---

1. 18 Pa.C.S. § 911(a), entitled "Findings of fact," states that the General Assembly had found that: (1) organized crime is a highly sophisticated, diversified, and widespread phenomenon which annually drains billions of dollars from the national economy by various patterns of unlawful conduct including the illegal use of force, fraud, and corruption;

 ( * * * * )

(3) the vast amounts of money and power accumulated by organized crime are increasingly used to infiltrate and corrupt legitimate businesses operating within the Commonwealth, together with all of the techniques of violence, intimidation, and other forms of unlawful conduct through which such money and power are derived.

*People v. Shapiro,* 431 N.Y.S.2d at 430–31, 409 N.E.2d at 906. "Title III . . . and the Fourth Amendment to the United States Constitution establish the outer limits of any intrusion into the protected privacy area. State standards which are more protective of this same area must, however, be given effect." *United States v. Geller,* 560 F.Supp. 1309, 1312 (E.D.Pa.1983), *affm'd* 745 F.2d 49 (3d Cir.), *cert. denied,* 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985). State statutes may narrow the scope of permissable state wiretapping, but may not permit state and local authorities to intercept wire and oral communications forbidden by the federal statute. Therefore, to the extent that the Pennsylvania wiretap statute authorizes wiretapping to investigate allegations of non-violent prostitution-related offenses, even if those offenses are categorized as "racketeering activities" within the corrupt organizations statute, the Pennsylvania wiretap statute contravenes 18 U.S.C. § 2516(2).

The New York Court of Appeals was presented with a quite similar situation in *People v. Shapiro.* 50 N.Y.2d 747, 431 N.Y. S.2d 422, 409 N.E.2d 897 (1980). *Shapiro* was an appeal from a criminal conviction for promoting prostitution in the first degree, endangering the welfare of a child, and second and third-degree sodomy. *Id.* None of the crimes involved violence or forcible coercion. *Id.* The New York state wiretapping permitted electronic interception for a much more encompassing range of crimes than the federal standard, including the offenses for which the defendant was under investigation and later convicted. *Id.*

The New York high court held in *Shapiro* that "the bases for the eavesdropping warrant in this case—allegations of sexual abuse and the promotion of prostitution—however violative of New York criminal law, do not come within the intendment of the Federal statute because they cannot be said to be crime[s] dangerous to life [or] limb." *Id.,* 431 N.Y.S.2d at 432, 409 N.E.2d at 907. The decision rejected the contention that the fact that "our own State Legislature has determined that such acts presented a substantial danger to life and

limb override[s] the considered judgment of Congress that they did not." *Id.,* 431 N.Y. S.2d at 432, 409 N.E.2d at 907–908. "The [federal] standard may not be expanded beyond the contemplation of the drafters to include within its sweep more subtle forms of personal injury, for example, any deleterious psychic consequences to minors that may result from their participation in such practices." *Id.,* 431 N.Y.S.2d at 432, 409 N.E.2d at 908. The court reversed Shapiro's conviction on the grounds that the evidence gleaned from the illegal wiretaps should have been suppressed. *Id.*

## B. *Is An IRS Criminal Investigation Interrogation A "Proceeding" Under Section 2518(10)(a)?*

Section 2518(10)(a) permits an "aggrieved person in any trial, hearing, or *proceeding* in or before any court, department, officer, agency, regulatory body, or other authority of the United States" to move to suppress the contents of unlawfully intercepted communications, "or evidence derived therefrom." 18 U.S.C. § 2518(10)(a) [emphasis added]. The Government argues that responding to a summons for documents and testimony from an IRS Criminal Division special agent does not amount to a "proceeding" within the meaning of section 2518(10)(a). They therefore take the position that there is no statutory authority to suppress the use of evidence tainted by the invalid state wiretap, leaving the respondents without a "just cause" defense to contempt of court.

Neither the section nor its legislative history define "proceeding" as used in section 2518(10)(a). The Government urges this Court to look to the legislative history for section 2518(9), which requires that notice be given of the intent to use the contents of any intercepted communication at least ten days before a "trial hearing or proceeding." 18 U.S.C. § 2518(9). The Senate Report for section 2518(9) gives this definition for proceedings at which such notice must be given:

"Proceeding" is intended to include all adversary type hearings. It would include a trial itself, a probation revocation

proceeding, or a hearing on a motion for reduction of sentence. It would not include a grand jury hearing ...

Omnibus Crime Control and Safe Streets Act of 1968, P.L. 90–351, Senate Report 1097, April 29, 1968, 1968 U.S.Code Cong. and Admin.News 2112, 2195. This definition of "proceeding" explicitly excludes grand jury hearings, and quite possibly IRS criminal investigatory summonses and interrogations as well.

*Gelbard v. United States*, the leading United States Supreme Court case on this statute, refutes the Government's argument that Title III offers no relief to the respondents in this case. 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). *Gelbard* involved federal grand jury witnesses, two each from California and Pennsylvania, who refused to testify on the grounds that the questions to be put to them were based on information overheard by means of illegal government wiretaps and electronic surveillance. Upon their refusal predicated on Title III, they were jailed for contempt of court. While the Ninth Circuit affirmed the California federal district court's contempt findings, the Third Circuit reversed the Pennsylvania federal district court's holding of Sister Joques Egan, the Pennsylvania grand jury witness, in contempt. *In re Grand Jury Proceedings, Harrisburg, Pa.*, 450 F.2d 199 (3d Cir.1971) (en banc). The United States Supreme Court reversed the Ninth Circuit and affirmed the Third Circuit in *Gelbard*, holding that grand jury witnesses had "just cause" defenses to contempt if they refused to testify when questions would be based on information acquired from illegal wiretaps. *Gelbard, supra.*

The *Gelbard* opinion did not explicitly discuss the definition of "proceeding," in fact it did not approach the contempt question in terms of suppression of evidence

under section 2518(10)(a). *Id.* Instead, the Court's ruling relied upon section 2515, which it described as "central to the legislative scheme." *Id.* at 50, 92 S.Ct. at 2362. Section 2515 provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial hearing, *or other proceeding* in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515 [emphasis added].[2] The respondents here rely on both sections 2515 and 2518(10)(a) as providing "just cause" not to be held in contempt for refusing to comply with the IRS summons directing them to produce records and testimony. *Gelbard* held that "just cause" to refuse to testify based on Title III prohibitions pertained to grand jury hearings. The necessary implication, therefore, is that the Government's preferred definition for "proceeding," which specifically excludes grand juries, would have been held inapplicable by the *Gelbard* court. We see no reason why the Government's narrow definition for "proceeding" should have any more application to the present case.

The more important question is the scope of "proceeding" in section 2515. 18 U.S.C. § 2515. Section 2515 bars the use of the contents of illegally intercepted communications, as well as evidence derived therefrom, in any "proceeding" before any "department, officer, agency, ... regulatory body ... or other authority" of the United States. *Id.* We think it clear from the plain language of section 2515, and from the broad range of "proceedings" listed therein, that a compelled appearance before

---

2. The legislative history for section 2515 explains:

> [I]t is not limited to criminal proceedings. Such a suppression rule is necessary and proper to protect privacy. The provision thus forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and civil remedies, it should

serve to guarantee that the standards of the new chapter will sharply curtail the unlawful interception of wire and oral communications.

Senate Report 1097, 90th Cong., 2d Sess., U.S. Code Cong. & Admin.News, pp. 2112, 2184 (cited in *Gelbard* at 50 n. 9, 92 S.Ct. at 2362 n. 9).

874

an IRS Special Agent of the Criminal Investigations Division conducting a criminal tax investigation, particularly when the summonsed individual is the target of that criminal investigation, is a "proceeding" within the intention of section 2515.

The Government attempts to distinguish *Gelbard* on the ground that the prosecutors in that case intended to "use" the allegedly tainted evidence during their examination of the witness, whereas "[t]he IRS does not intend to 'use' anything in order to obtain those documents, other than the summons which this Court has already ordered the respondents to comply with." Petitioners' Memorandum of Law in Advance of Contempt Hearing [Government's Memorandum of Law], p. 5.

■ The first flaw in the Government's analysis is that the "proceeding" in question is not this Court's contempt hearing, but rather the appearance of Mr. Birdseye and the respondents before IRS Special Agent Sherlock. The fact that no tainted evidence needed to be "used" in order to *enforce* the summons is irrelevant. The pertinent question is the extent to which the exclusionary provisions of sections 2515 and 2518(10)(a) apply to the obligation of the respondents to accede to the IRS's direction that they supply records and testimony to Special Agent Sherlock.

More substantively, the Government ignores the *Gelbard* Court's concern for the use before government bodies of the contents of illegally intercepted communication or evidence derived therefrom. Even if Special Agent Sherlock conducted his interrogation of Birdseye without explicitly referring to an excerpt from the illegally wiretapped conversations nor to a single document seized from the tainted searches that followed, the respondents may still rely on the protection of Title III and the

*Gelbard* decision if the requests for documents and testimony were based on information from the illegal wiretap, "or evidence derived therefrom." 18 U.S.C. §§ 2515, 2518(10)(a).[3]

The testimony heard and evidence submitted at the contempt hearing for this case convinces us that the materials seized by state and local police during the raids of the Birdseye residence and businesses were the stimulus and the critical source of information for the IRS's criminal investigation into William Robert Birdseye. Prior to these raids, the IRS had merely filed away chance tips received as by-products from other investigations. No single agent was assigned to the investigation until after the tainted state and local searches. When Special Agent Sherlock was first put on the case, it was to sift through the documents seized in the raids. Soon thereafter Sherlock began his own inquiries, ordered copies of income tax returns, opened a criminal investigation by numbering the case, and issued the summons now contested. Special Agent Sherlock himself testified that he believed Birdseye would have been investigated in any event, because the IRS considers involvement in prostitution a "sure sign" of unreported income. We were not convinced of the accuracy of Sherlock's speculation. The fact remains that IRS Agent Blum had been informed of state prostitution allegations against Birdseye as early as November of 1985, yet he took no action and did not open a criminal investigation. Agent Blum, now deceased, cannot testify as to whether he intended to open a criminal investigation of Birdseye, however his report made no mention of unreported income. Sherlock testified that at the time he began looking into Birdseye, there was as yet no information to indicate that there were tax law violations. The evidence at the contempt hearing convinced

---

**3.** One of the grand jury witnesses asserting "just cause" in *Gelbard,* Sister Joques Egan, had been granted transactional immunity with regard to the grand jury investigation for which she refused to testify. Her refusal, therefore, was based exclusively on her privacy interests and not on concerns for self-incrimination.

In the present case, William Robert Birdseye and the respondents have received no such im-

munity. In fact, the purpose of the summons is to explore Birdseye's criminal liability. In this sense the case at bar present even more compelling circumstances than in *Gelbard* for concern about the individual's privacy rights and governmental agencies benefitting from the fruits of illegal wiretaps.

us that *but for* the IRS's review of the documents seized by state and local authorities, Special Agent Sherlock's criminal tax investigation of William Robert Birdseye, initiated only after Sherlock had scrutinized the documents yielded by the raids by state and local authorities and nearly a year after the IRS had learned of alleged prostitution related activities by Birdseye, would not have occurred.

The seized records reviewed by Special Agent Sherlock in late July or early August of 1986, the evidence which caused Sherlock to initiate this criminal investigation, were tainted because the probable cause for the searches was information intercepted by the illegal wiretaps. Our contempt hearing unearthed little to indicate that the summons and possible questions to Birdseye were not based on tainted information, and revealed considerable evidence indicating that they were indeed tainted. As in the *Gelbard* case, Birdseye and the respondents argue that the summons and the intended questions are a use of the tainted evidence, and any testimony which Birdseye might give in answer to those questions would be tainted evidence "derived from" the illegal wiretap. We agree.

### C. Supreme Court's Application of Title III in Gelbard v. United States

We are guided not only by the letter but also by the spirit of the *Gelbard* decision. In its en banc decision, affirmed by the Supreme Court in *Gelbard,* the Third Circuit asserted that:

> even if Sister Egan has no *statutory* defenses to the judgment of civil contempt, the Fourth Amendment would require that the case be remanded to the District Court for a hearing regarding

her allegations that the grand jury questions in this case are the fruits of unconstitutional electronic surveillance.

*In re Grand Jury Proceedings, Harrisburg, Pa.,* 450 F.2d 199, 210 (3d Cir.1971). The Supreme Court's affirmance emphasized Congress's concern for protecting individuals from electronic invasions of their privacy by Government, and concluded that "the protection of privacy was an overriding congressional concern." *Gelbard* at 49, 92 S.Ct. at 2361.[4] The Court quoted the Senate report which specifically addressed itself to the enforcement, by means of § 2515, of the limitations upon invasions of individual privacy:

> ... Only by striking at all aspects of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provisions must be made for civil recourse for damages. *The perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings.* Each of these objectives is sought by the proposed legislation.

*Gelbard* at 49–50, 92 S.Ct. at 2362 (quoting Senate Report No. 1097, *supra,* U.S.Code Cong. & Admin.News, pp. 2112, 2156 (emphasis in *Gelbard*).

The *Gelbard* decision stressed that section 2515's "importance as a protection for 'the victim of an unlawful invasion of privacy' could not be more clear." *Id.* at 50, 92 S.Ct. at 2362. "The purposes of § 2515 and Title III as a whole would be subverted were the plain command of § 2515 ignored when the victim of an illegal interception is called before a grand jury and asked ques-

---

**4.** Footnote 10 of the *Gelbard* decision reiterates the strong privacy concerns underlying Title III:

> Congressional concern with the protection of the privacy of communications is evident also in the specification of what is to be protected. "The proposed legislation is intended to protect the privacy of the communication itself...." [Senate Report No. 1097, U.S.Code Cong. & Admin.News 1968, pp. 2112, 2178] As defined in Title III, "'contents,' when used with respect to any wire or oral communication, includes any information concerning the

identity of the parties to such communication or the existence, substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The definition thus "include[s] all aspects of the communication itself. No aspect, including the identity of the parties, the substance of the communication between them, or the fact of the communication itself, is excluded. The privacy of the communication to be protected is intended to be comprehensive." S.Rep. No. 1097, *supra,* at 91; U.S. Code Cong. & Admin.News, pp. 2112, 2179.

tions based upon that interception." *Id.* at 50–51, 92 S.Ct. at 2362. We find it no less a subversion of the purposes of Title III when, as here, a victim of an illegal interception is called before an IRS agent requesting documents and asked questions based upon evidence derived from an illegal interception.

The Court went on to explain that "§ 2515 serves not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct." *Id.* at 51, 92 S.Ct. at 2362–2363. The decision reasoned that:

> [for a court] to order a grand jury witness, on pain of imprisonment to disclose evidence that § 2515 bars in unequivocal terms is both to thwart the congressional objective of protecting individual privacy by excluding such evidence and to entangle the courts in the illegal acts of Government agents.
>
> In sum, Congress simply cannot be understood to have sanctioned orders to produce evidence excluded from grand jury proceedings by § 2515.

*Id.* at 51, 92 S.Ct. at 2363. By not allowing § 2515 as a defense to a contempt charge, "disclosure through compelled testimony makes the witness the victim, once again, of a federal crime." *Id.* The recognition of § 2515 as a defense also "relieves judges of the anomalous duty of finding a person in civil contempt for failing to cooperate with the prosecutor in a course of conduct which, if pursued unchecked, could subject the prosecutor himself to heavy civil and criminal penalties." *Id.* (quoting *In re Grand Jury Proceedings, Harrisburg, Pa.,* 450 F.2d at 220 (Rosenn, J., concurring). The Supreme Court finally quoted D.C. Circuit Judge Skelly Wright, who wrote that:

> [F]or a court, on petition of the executive department, to sentence a witness, who is herself the victim of the illegal wiretapping, to jail for refusal to participate in the exploitation of that crime in violation of the explicit command of Section 2515 is to stand our whole system of criminal justice on its head.

*Id.* at 52, 92 S.Ct. at 2363 (quoting *In re Evans,* 146 U.S.App.D.C. 310, 323, 452 F.2d 1239, 1252 (1971) (Wright, J., concurring).

The United States Supreme Court's *Gelbard* decision found that Title III's exclusionary rule protects the privacy of individuals as well as the integrity of the courts by forbidding the judiciary from permitting state and federal law enforcement authorities from exploiting illegal wiretaps or evidence derived therefrom. The *Gelbard* decision therefore directs that victims of illegal wiretaps, such as the respondents here, should not be compelled by an order of this Court to produce physical and testimonial evidence requested by the Government as a result of the Government's illegal interception of wire and oral communications.

III. *Inevitable Discovery And Attenuation Doctrines*

The Government argues that, even if the wiretaps were illegal, the Court should nonetheless enforce the IRS summons if it is found that the Government would have acquired the illegally intercepted information without the illegal wiretap. We are not altogether certain of the applicability of the inevitable discovery and attenuation doctrines, corollaries to the judicially created exclusionary rule, to Title III's statutory exclusion policy. We will nonetheless apply these principles to the facts of the case before us.

A. *Inevitable Discovery Doctrine*

■ The inevitable discovery exception to the exclusionary rule is based on the reasoning that the purpose of the exclusionary rule is to put the government in the same position it would have been absent the illegal conduct, but not to put the government in a worse position because of police error or misconduct. *See Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In *Nix v. Williams,* a murder suspect was questioned without his attorney present, in violation of the Sixth Amendment. He led the police to the body of the child he had murdered and that evidence was offered against him at trial.

The Supreme Court affirmed the conviction in partial reliance on the inevitable discovery doctrine, finding that searchers inevitably would have discovered the child's body without the defendant's help. *Id.* The Court held:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.

*Id.* at 444, 104 S.Ct. at 2509. At the hearing, we invited the Government to present evidence to establish by a preponderance that the tainted evidence it used to initiate its criminal tax investigation of Birdseye, and the summons at issue inevitably would have been discovered by lawful means.

The Government attempted to meet this burden by showing that the records sought by the summons were books and records kept in the ordinary course of business and that they would have been requested as a natural step once any criminal tax case was opened. While this may be so, such a showing does not indicate that a criminal tax case inevitably would have been opened to set the chain of events into motion. The Government asserts that Agents Blum and McCoffsky had been working toward a criminal investigation. Yet as we previously noted, there was nothing presented at the contempt hearing to support this contention aside from Special Agent Sherlock's speculation to that effect. Blum's report contained no mention of possible tax violations, and neither Blum nor McCoffsky ordered copies of either the respondents or the Birdeye's tax returns or took any steps toward opening a case.

Sherlock testified that by the time he had first begun to work on the Birdseye investigation, there was as yet no information to indicate a violation of tax laws aside from the generalized suspicion that prostitution is a "sure sign" of unreported income. Had the state and local authorities not illegally tapped the Birdseye telephones and seized the tainted records, the evidence indicated that it was far from inevitable that the IRS would have opened a criminal tax case against William Robert Birdseye, issued the summons or seized the respondents' records under authority of their own search warrant. We therefore find that the Government has failed to show by a preponderance that the tainted evidence which is the basis for its criminal investigation and the summons for records and testimony would ultimately or inevitably have been discovered absent the violations of Title III.

### B. *Attenuation Doctrine*

■ The Government cites *Silverthorne Lumber Co. v. United States* and the attenuation doctrine to support its contention that despite government wrongdoing in obtaining the books and records, the respondents should nonetheless comply with the summons because the evidence upon which it is based was gained from independent sources. Government's Memorandum of Law, pp. 10–12; *see also Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920) (Holmes, J.). In *Silverthorne Lumber,* Justice Oliver Wendell Holmes denounced the government's position in that case that:

> although of course its seizure was an outrage which the government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession, but not any advantages that the government can gain over the object of its pursuit by doing the forbidden act.

*Silverthorne Lumber* at 391, 40 S.Ct. at 182. Holmes found such a contention reduced the Fourth Amendment "to a form of words." *Id.* at 392, 40 S.Ct. at 183. "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all." *Id.* Holmes clarified that this does not mean that these

facts become "sacred and inaccessible," but that:

> If knowledge of them is *gained from an independent source* they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed.

*Id.* [emphasis added]. Thus in a case decided nearly seventy years earlier yet mirroring the facts we examine today, Justice Holmes reversed the judgment imposing fine and imprisonment for contempt of court against a corporation and its owner for refusal to obey a court order to comply with a grand jury subpoena to produce corporate books and records. *Id.* If the Government is unable to show an independent source in the present case, as it was unable to do in the *Silverthorne Lumber* case, we will be bound to reject its application of the attenuation doctrine and refuse, as did Justice Holmes, to hold the respondents in contempt.

The Government has made little or no showing that it had acquired the knowledge of Birdseye's alleged criminal tax violations, or of unreported income by the respondent corporations, from an untainted independent source. In fact, in its Memorandum of Law, pp. 10–12, and in its arguments at the contempt hearing, the Government asserts that because it was state and local authorities who conducted the illegal wiretap and searches, the IRS's receipt of the tainted evidence was "attenuated" from the wrongdoing.

"Simply stated, even if the wiretaps were illegal," the Government argues, "the summons is simply too attenuated from the illegality to permit the respondents to defy this Court's Order directing them to comply." Government's Memorandum of Law, pp. 11–12. The Government argues by analogy to *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), that the prohibitions on use of tainted evidence in § 2515 should not be applied to an IRS summons. *Janis* held "that the judicially created exclusionary rule should not be extended to forbid the use in [a] civil proceeding of one sovereign of evidence seized by a criminal law enforcement agent of another sovereign." *Janis* at 459–460, 96 S.Ct. at 3034–35, 49 L.Ed.2d at 1064. *Janis* is distinguishable from this case in three respects. First, the IRS was involved in the actual seizure of the tainted evidence to a certain degree through Special Agent Clark's participation in the July 18, 1986 raid on the Birdseye residence. In addition, the affidavit supporting the application for the illegal wiretap included an account of an interview with an alleged prostitute conducted by several law enforcement officials, including IRS Agent Robert Tate and Assistant United States Attorney Judy Giltenboth (the prostitute was a government witness in a separate federal prosecution by Tate and Giltenboth). Second, *Janis* dealt with "the judicially created exclusionary rule," and not the statutory prohibitions under Title III. *Id.* The concerns of *Gelbard* and Title III that the violation of the privacy rights of victims of illegal wiretaps would be compounded by the use of that evidence in later proceedings is different from the primary deterrence concern underlying the judicially created exclusionary rule. The *Janis* Court emphasized the absence of significant additional deterrence value when evidence is excluded from a taxpayer's federal civil tax suit when the illegal conduct was undertaken as part of a city criminal investigation.[5] Even if Congress had conceived the scope of Title III's prohibitions to be equivalent to the scope of the judicially created exclusionary rule in 1968,[6] it could not have presaged the Supreme

---

**5.** "[T]he imposition of the exclusionary rule sought in this case is unlikely to provide significant, much less substantial, additional deterrence." *United States v. Janis* at 458, 96 S.Ct. at 3034, 49 L.Ed.2d at 1063.

**6.** According to the Senate Report, the Title III prohibitions on the use of evidence derived from illegal interceptions:

> largely reflects existing law. It applies to suppress evidence directly or indirectly obtained in violation of the chapter.... There is, however, no intention to change the attenuation rule ... Nor generally to press the scope of the suppression role beyond *present* search and seizure law.

Senate Report 1097, *supra,* at 2112, 2185 [emphasis added].

Court's *Janis* decision eight years after the passage of Title III. Nothing in the statute's legislative history indicates that it intended for the scope of its prohibitions to expand and contract with the fortunes of the judicially created exclusionary rule. Finally, while *Janis* dealt with the use of evidence in a taxpayer's civil tax suit, the summons here was issued in relation to an IRS criminal tax investigation, which we believe raises more significant concerns under Title III, and conceivably more substantial deterence value as well. We therefore find the holding of *Janis* inapplicable to Title III and this case.

Because the Government has failed to prove that it had an independent source for the tainted evidence which is the basis for the criminal tax investigation and the summons, and because *Janis* is inapplicable to this case, we refuse to hold the respondents in contempt of court under an attenuation theory.

IV. *Conclusion*

After conducting a contempt hearing at which factual evidence and legal arguments were heard by this Court, we conclude that the wiretaps which formed the probable cause necessary to authorize searches of the Birdseye residence and corporations were in violation of Title III. Title III prohibits the use of evidence derived from illegal wiretaps, and we find that the IRS's criminal tax investigation of William Robert Birdseye, the summons directing him to produce documents and testimony, and any testimony he and the respondent corporations would be compelled to give would all be derived from the illegal wiretaps. We also find that the Government has failed to meet its burden of showing that the inevitable discovery or attenuation doctrines have application in this case such that this Court should enforce the IRS's summons despite the violation of Title III. We therefore find that the respondents have "just cause" not to comply with this Court's January 7, 1988 Order directing them to comply with the IRS summons, and we will not hold them in contempt of court.

ORDER

AND NOW, this day 18th of April, 1988, after careful consideration of the Petitioners' application for contempt against the Respondents for disobeying this Court's Order dated January 7, 1988, by refusing to appear, testify, and provide the summoned documents which were ordered to be produced, and upon careful consideration of the pleadings, exhibits, testimony of witnesses, arguments of parties and a full hearing of the matter, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Petitioners', United States of America and James L. Sherlock, Special Agent of the Internal Revenue Service, application for contempt against the Respondents, Millstone Enterprises, Inc., R & R Trucking and Transportation, Inc., Vee's Book Boutique, Inc., Truckers Training and Transfer, Inc., Businessman's Management and Consulting Company, Inc., and Boulevard Bookstore, Inc., is DENIED.