*752 OPINION OF THE COURT
Fuchsberg, J.
After trial by jury, defendant Elliot Shapiro was convicted on a consolidated indictment of promoting prostitution in the first degree and endangering the welfare of a minor (under Indictment No. 117), sodomy in the second degree (under Indictment No. 118), and 11 counts of sodomy in the third degree (under Indictment No. 143).[1] In his appeal to us he claims, in the main (1) that, in the circumstances of the case, it was an abuse of discretion as a matter of law for the trial court to have denied his motion to sever Indictment No. 143 from the trial of the other two; (2) that his due process rights were violated when, while his three prospective witnesses were considering whether to persist in the invocation of their privilege against self incrimination, the District Attorney openly, repeatedly and unqualifiedly advised them that testimony on behalf of the defendant would subject them to prosecution for perjury; and (3) that the eavesdropping orders secured by the police were invalid because they exceeded the bounds set by the governing Federal wiretapping statute (US Code, tit 18, § 2516). We find merit in each of these contentions and, therefore, reverse defendant’s conviction and order a new trial.
Pertinent to the analyses on which these conclusions rest are the following:
In Indictment No. 143, Shapiro was accused of engaging repeatedly in a course of homosexual sodomitic acts on various occasions over a 17-month period between July, 1972 and November, 1973 with eight different high school boys each of whom was under the age of 17. Though it developed at trial that each of the youths had received money from the defendant, it was never claimed that force of any kind was employed to obtain their participation. In all, this indictment embraced a total of 64 criminal counts.
The other two indictments (No. 117 and No. 118), unlike No. 143, were not premised on any explicit or implicit claim that the defendant was a frequent actor in sexually aberrant conduct but, centering rather on the far more serious crime of promoting such conduct, confined themselves to a single event *753 occurring on January 31, 1974. That night, members of the New Rochelle Police Department, the Westchester County Sheriffs Department and the District Attorney’s office, executing a search warrant based largely on evidence that derived from court-ordered wiretapping of defendant’s telephone, gained admission to Shapiro’s residence. From the intercepted telephone conversations, the police had learned that two of the defendant’s adult friends, Eli Shomer and Ronald Senn, planned to bring two young teen-age male "prostitutes” to Shapiro’s home to perform sex acts for hire and that another adult, Brian Dowling, was also to join in these activities. When the police entered, they found Shomer and Senn, attired, in the living room. Making their way to the upper part of the house, the officers then came upon Dowling and 15-year-old Gary F. lying completely unclad in bed together in one bedroom and defendant and 13-year-old Duane S. nude in the other. It was in the first of the two indictments (No. 117) based on this incident that defendant, along with Shomer and Senn, was charged with promoting prostitution as well as endangering the welfare of a minor; its companion indictment (No. 118) charged Shapiro alone with sodomy, sexual misconduct, sexual abuse and endangering the welfare of a minor, all additional legal formulations of the transgressions said to have occurred on the self-same January 31. Thereafter, Shomer’s and Senn’s cases were severed from that of Shapiro and tried separately. It was later, two years after the original indictments had been voted, that the People, before proceeding to trial against Shapiro, moved to consolidate all three accusatory instruments against him. It is the granting of this motion and the denial of defendant’s subsequent application to sever with which we deal first.
I
The joinder of the indictments was effected under the authority of CPL 200.20 (subd 4). This section permits a court for trial purposes to consolidate and treat as a single indictment "two or more indictments against the same defendant * * * [which] charge different offenses of a kind that are joinable in a single indictment”. The determination of the application is discretionary (CPL 200.20, subd 5). Defendant does not challenge the joining of the two indictments stemming from the January 31, 1974 incident (see CPL 200.20, subd 2, par [b]), but argues, as he did when the original motion was made, that *754 it was improper to try these with the indictment featuring the long train of sodomies which took place in so much of the two previous years, on the ground that the latter counts would prejudice his ability to defend on the former.
If justification for the joinder of the multiple event indictment with the others is to be found it would have to be under the statute’s broadest possible conception of "joinable offenses”, i.e., when two or more "offenses are defined by the same or similar statutory provisions and consequently are the same or similar in law” (CPL 200.20, subd 2, par [c]). But this language does not stand alone. Apparently cognizant of the sweeping compass of this provision, the legislative scheme introduces cautions designed to alleviate the potential for prejudice. Thus, CPL 200.20 (subd 3) declares that, when the joinability of offenses rests solely on the grounds specified in paragraph (c) of subdivision 2, "the court, in the interest of justice and for good cause shown, may, upon application of either a defendant or the People, in its discretion order that any one of such offenses or groups of offenses be tried separately from the other or others”. Surely, "the interest of justice” and "good cause shown”, though elastic, are more than resounding phrases.
True, in determining that consolidation was appropriate, the court noted the following points of similarity: the defendant was the sole untried defendant in each of the three indictments; all counts in the indictments referred to sexual acts with boys under the age of 17; all the activities occurred within the same jurisdiction and most occurred in defendant’s home; sodomy or sexual abuse were a focus of all three indictments. Nevertheless, it cannot be gainsaid that these were but the most general of commonalities; without more support, a joinder could hardly be said to serve more than the permissible purpose of judicial economy.
In counterpoint, the thrust of defendant's more particularized objection was that Indictment No. 143, because of the multiplicity of its 64 counts, carried an almost irresistible potential for prejudicing his defense of the charges arising out of the unrelated January 31, 1974 incident, the only one on which promoting was alleged. The inference of an indiscriminate propensity to be a party to the event on which Nos. 117 and 118 were based could be especially unfair in light of the dearth of physical evidence of any act of sodomy with Duane S., admittedly the only individual in whose presence defen *755 dant was found at the time the police broke in. As the proof at trial unfolded, the cumulative effect of the repetitive recitations of the eight high school students on whom the People depended to describe the defendant’s numerous depredations during the 18-month period covered by No. 143 was bound to come across as a pointed prologue to the January 31 episode from which Nos. 117 and 118 alone were derived.
In these unique circumstances, it therefore was foreseeable that the trial of the latter would be compromised by the strongest of suggestions that it was but the inevitable outgrowth of defendant’s untoward sexual predisposition, however sociologically and scientifically tenuous such connection may in fact have been (see Gregg, Other Acts of Sexual Misbehavior and Perversion as Evidence in Prosecutions for Sex Offenses, 6 Ariz L Rev 212, esp 231-236). Since prosecutions for sex crimes, particularly ones regarded as deviate, tend in any event to invoke prejudicial preconceptions among jurors, the joinder of the indictments created an impermissible risk.[2] For the superficial closeness of the indictments here, resulting largely from a common focus on the same kind of aberrant sexual practices, was likely to eclipse the very fundamental difference between them. Indictment No. 117 involved the much graver accusation that Shapiro had done more than yield to his irresistible and therefore perhaps compassionately viewed sexual impulses. That wider role, the far more heinous and socially damaging one of influencing others to enter upon a life of submission to sexually aberrant conduct, especially when the proselytizing is said to have been for profit, was almost sure to strongly suggest a need to deter.
In this connection, it is of course easy to say that jurors, like Judges, may have had the intellectual capacity and emotional control to sort out the separate roles in which the defendant was being portrayed so that one would not be merged into the other. Indeed, I believe we all recognize that intelligence is no more the monopoly of Judges than it is of *756 jurors. But it is equally true, as any practitioner of the trial process or of life who has moved from initiate to sophisticate can tell, that the average layman, astute and restrained as she or he may be, and though advantaged by the freshness of such a juror’s venture into the legal arena, cannot hope to share the appreciation of the subtleties of prejudice in such a context gained by Judges and trial lawyers through hard and repeated experience.
We do not suggest that Judges do not have latitude in evaluating the likelihood and gravity of prejudice when consolidation of several indictments is sought. As we have observed, the statute confers discretion upon the court (CPL 200.20, subd 2, par [c]). But in the peculiar circumstances of this case, that discretion was abused. Significantly, the trial court’s response to defendant’s contention that he would be sorely prejudiced by the joinder manifested a failure to weigh any of the relevant, and here critical, considerations. For the court merely opined that, given the testimony of the eight other youths, anything added by either Duane S. or Gary F., necessarily confined to January 31 alone, would have limited, if any, bearing on propensity. But this was to view the problem from the wrong end. The chief cause for concern, of course, was not the effect of the single charge of promoting on the fairness of the trial for the numerous sodomies set out in No. 143, but the massive impact of the latter on the solitary promoting count. In short, it does not appear that the court even considered the risk that a joint trial would expose the defendant to the possibility of being convicted on 117 and 118 for reasons other than those legally relevant to the specific crimes these two indictments charged. (See Matter of William S., 70 Misc 2d 320, 324; People v Reingold, 44 AD2d 191, 195; People v Forest, 50 AD2d 260.)
Moreover, the claim of prejudice, renewed in defendant’s subsequent motion under CPL 200.20 (subd 3) to sever Nos. 117-118 from No. 143, assumed even more substantial proportion. Shapiro swore that, though he did not plan to take the stand in No. 143, presumably electing to rely instead on his legal defenses,[3] he desired to do so in Nos. 117-118 because he was "the only person in a position” to deny any intention to promote or advance prostitution.
*757 Needless to say, severance is not necessarily to be had for the asking. There should be a showing of good cause for the relief requested. Conclusory generalities will not usually suffice. And mere self-serving representations may be suspect. But, given that the sufficiency of the defendant’s showing must be judged in the context of the obvious and undisputed circumstances against which it is made, here there was much more. The juxtaposition of the separate sets of charges — one focusing on a single evening and the other on a span of a year and a half, the difference in the grade of the offenses, the fact that, other than himself, not a single one of those figuring in the one indictment would have any reason to be called in the other, the inflammatory nature that the proof of each would almost inevitably exert on the other — presented a situation too self-evident to be disregarded (cf. People v Dodge, 72 Misc 2d 345). For, in the prevailing circumstances, joinder of the indictments had to add impermissibly to what at best was the inherently difficult choice defendant faced in deciding whether to "bear the risk on both counts, although he may benefit on only one” (Cross v United States, 335 F2d 987, 989 [Bazelon, Ch. J.]). Here the practical result of the denial was to relegate him to no more than a Hobson’s choice. For these reasons the denial of the motion to sever was an abuse of discretion as a matter of law.
II
The prejudicial impact of the consolidation was only enhanced when the other witnesses whom Shapiro had expected to call to the stand in his defense of the charges emanating from the events of January 31, after initially raising the privilege against self incrimination, persisted in their refusal to testify. This followed directly after the District Attorney issued repeated and unequivocal warnings the sense of which was that the witnesses would subject themselves to prosecution for perjury if their testimony was favorable to the defendant.
The prosecution’s chief witness to the activities of January 31 was the young male "prostitute” Duane S., who testified that on that date, after Shomer and Senn had driven him and Gary F. from Boston to Shapiro’s home for the purpose of having them take part, for a consideration, in deviate sexual conduct with two men, the defendant engaged in anal intercourse with him. Shapiro’s defense to the accusation that cast *758 him in the role of a promoter of prostitution appears to have been to portray himself as a man whose uncontrollable sexual urges made him the easy dupe of Shomer and Senn, the real and sole promoters, who manipulated Shapiro so they could stage their activities in his home. To establish that his role was so limited, he proposed to call all the other participants in these events who were available as witnesses. Examination of his ensuing offer of proof revealed that according to counsel’s representations, Gary F. would have testified that, when the boys appeared at his door, Shapiro wanted nothing to do with them and was reluctant to admit them. Shomer, too, Shapiro’s counsel advised the court, would have countered the inference of promoting by testifying that Shapiro acted only as patron. As to Dowling, whose wiretapped conversation with Shapiro was heavily relied on by the District Attorney to try to prove defendant’s soliciting and promoting, counsel assured the court that he expected that this witness would testify that he had intended to visit Shapiro socially before he learned of Shomer and the boys’ existence and that, to his knowledge too, Shapiro was never more than a patron. (See Penal Law, § 230.15.)[4]
Despite these assurances, when defendant sought to call them at trial, each witness, appearing in chambers in the company of his own counsel, invoked his privilege against self incrimination. However, from the colloquy that ensued, it soon became apparent that the protection the witnesses sought was not from disclosure of any past criminal activities but solely from the possibility that any testimony they would give on behalf of Shapiro would precipitate their prosecution for perjury.[5] All three of these prospective witnesses had testified previously: Shomer and Dowling at their own trial, Gary F. before the Grand Jury under immunity, at a CPL 660.10 proceeding and, again, at the joint trial of Shomer and Senn.
*759 And it was unswerving and unconditional adherence to their prior testimony that the prosecution demanded. At every turn he reiterated his resolve to prosecute any deviation for perjury. Thus, after twice stating to Gary F. and his counsel, in camera and in the presence of defendant’s attorney, that the witness would be "subjecting himself’ to prosecution for perjury "if he gets on the stand now and tells a different story than he told before the Grand Jury or any other body that he appeared before”, he went on: "I would state for the record very clearly [that] if this individual * * * gets on the stand and gives a different story, we will make every effort to prosecute for any perjurious testimony.” The threat could hardly have been more explicit, particularly in view of the prosecutor’s apparent strategy, in disregard of his professional obligation, if not of his ethical duty, to communicate the strongly worded admonitions directly to the witnesses rather than allow their decision whether or not to testify to be made after consultation with their own counsel. Later in the in camera hearing, the Trial Judge summed up the District Attorney’s over-all position with respect to the prospective testimony of Shomer as follows: "As I understand the proposition of the People * * * it’s that [if] the testimony on this trial was different than when he testified before, they would hold him for perjury.”[6]
Faced with these unveiled threats, each of the prospective witnesses insisted that he would not testify unless he were first given immunity by the prosecutor. Despite the urging of the trial court, which denied defendant’s application that it direct the prosecutor to do so, the District Attorney refused. The ultimate effect was to deprive defendant of any direct witnesses to his side of the story,[7] leaving Duane S., who could not be prosecuted because of his youth (Penal Law, § 30.00) and because of the prosecutor’s own election to call him before the Grand Jury (see CPL 190.50, subds 2-4), to give the only version of the January 31 incident the jury was to hear.
To be sure, ordinarily, exposure, whether to perjury or other *760 criminal charges, is a sufficient basis for a witness’ invocation of the privilege against self incrimination (see People v Sapia, 41 NY2d 160, 164; People v Arroyo, 46 NY2d 928). However, there are times when the exercise of this constitutional right may press on a defendant’s due process right to a fair trial and to compulsory process (US Const, 6th, 14th Arndts; NY Const art I, § 6), all the more so when, as in the present case, the offenses are of such a nature that the only persons capable of furnishing useful testimony will be those implicated in some way in the crime (Kastigar v United States, 406 US 441, 446).
Given that the power to confer immunity and thereby to compel testimony from a witness who asserts his privilege resides within the discretion of the prosecutor (see CPL 50.20, subd 2, par [b]), in an appropriate case it is not too much to expect that the exercise of this prosecutorial discretion be tempered by an obligation to respond to such a problem. On that principle, in cases in which witnesses favorable to the prosecution are accorded immunity while those whose testimony would be exculpatory of the defendant are not, or in ones where the failure to grant immunity deprives the defendant of vital exculpatory testimony, due process may be violated (see People v Sapia, supra, at p 166; People v Arroyo, 46 NY2d 928, 930, supra; Earl v United States, 361 F2d 531, 534, n 1 [Burger, J.], cert den 388 US 921; United States v Gaither, 539 F2d 753 [Bazelon, J., statement on denial of rehearing en banc], cert den 429 US 961; United States v Saettele, 585 F2d 307, 310-314 [Bright, J., dissenting]; State v Broady, 41 Ohio App 2d 17; Westen, Compulsory Process Clause, 73 Mich L Rev 71, 166-170; Note, Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses, 91 Harv L Rev 1266).
 It is also well-settled law that one who is granted immunity in return for his testimony receives no license to swear falsely with impunity while under the protection of that immunity (Glickstein v United States, 222 US 139; United States v Apfelbaum, 445 US 115, 131; McCormick, Evidence [2d ed], § 143, p 308; see CPL 50.10, subd 1). However, in this case the witnesses did not seek immunity for any false statements they might make at Shapiro’s trial. Confronted with the prosecutor’s ominous injunction that they be consistent above all else, they sought assurance that any misstatements or inconsistencies they may have uttered during the course of *761 their prior testimony would not suddenly become prosecutable after their appearance on defendant’s behalf. Accordingly, the District Attorney’s refusal to extend immunity, not to speak of the menacing terms in which he did so, could have served no purpose other than to irretrievably bind the witnesses to their previous sworn versions, accurate or not. By doing so, it impermissibly affected their meaningful exercise of their Fifth Amendment rights and insured their unavailability as witnesses for the defendant. The prosecutor’s conduct was, therefore, clearly erroneous.
From this perspective the case fits easily within those rulings which hold that substantial interference by the State with a defense witness’ free and unhampered choice to testify violates due process as surely as does a willful withholding of evidence. For example, in Webb v Texas (409 US 95), the Trial Judge singled out the defendant’s only witness for a lengthy admonition on the dangers of perjury, assuring the witness that if he lied he would be prosecuted and probably convicted. In reversing the defendant’s conviction, the Supreme Court held the refusal to testify on Fifth Amendment grounds directly traceable to judicial intimidation. Similarly, in United States v Morrison (535 F2d 223, cert den sub nom. Boscia v United States, 429 US 824), a case closer to the one before us, the defendant was found to have been denied due process when the prosecutor drove defendant’s principal witness from the stand by repeatedly threatening her with criminal charges, including perjury, if she testified. (See Clark v State, 585 P2d 367 [Okla] [prosecutor’s threat to file perjury charges]; Campbell v State, 37 Md App 89 [prosecutor’s threat to reopen stet processus on key witness to prevent his testifying in defendant’s behalf]; United States v Hammond, 598 F2d 1008 [FBI agent’s threat to retaliate against witness]; cf. United States v Henricksen, 564 F2d 197 [condition of codefendant’s plea bargain requiring him not to testify at defendant’s trial, though his testimony would have tended to exonerate defendant].) The District Attorney’s unwarranted action against Shapiro’s prospective witnesses led to the same unconstitutional result. Furthermore, the prejudice in the present case was not lightened when the Trial Judge refused to instruct the jury on the reason the witnesses were not called to the stand (see People v Sapia, 41 NY2d 160, 164, supra).
All this is not to disregard a District Attorney’s obligation to warn potential witnesses of their possible liability for false *762 statements under oath. We hold only that such warnings must not be emphasized to the point where they are transformed instead into instruments of intimidation. (Cf. Webb v Texas, supra, at p 97; United States v Winter, 348 F2d 204, 210 [Weinfeld, J.].) Our Sixth and Fourteenth Amendment guarantees serve to insure that a criminal trial does not devolve into a game to be won or lost whatever the means. Certainly, neither coercion nor the withholding of relevant testimony is tolerable. Nor may such results be justified on the presumption that the witnesses in question will swear falsely. Especially is the injunction to be fair levied at the District Attorney, whose office demands that he represent interests far broader than the outcome of a single trial (Code of Professional Responsibility, EC 7-13; cf. People v Thomas, 47 NY2d 37, 43-44).
For such reasons and because the effect of the intimidation on the witnesses’ decision not to testify may not now be erased, under the circumstances of this case we believe that, on a new trial, the only way in which the prejudice created by the prosecutor’s threats can be dispelled would be to require that the defendant’s witnesses be granted immunity as a condition to subjecting the defendant to a new trial (see United States v Morrison, supra, at p 229; United States v Paiva, 294 F Supp 742, 746; Note, 91 Harv L Rev 1266, 1269; cf. Westen, Compulsory Process Clause, 73 Mich L Rev 71, 170, n 477; United States v Leonard, 494 F2d 955, 985, n 79 [Bazelon, Ch. J., concurring and dissenting]); United States v De Palma, 476 F Supp 775).
Ill
We turn now to defendant’s argument that the wiretapped telephone conversations and their fruits must be suppressed because the eavesdropping orders, conceded to have been properly made under State law (CPL 700.05, subd 2), exceeded the grounds of permissible State regulation as defined by the Federal wiretapping statute (US Code, tit 18, § 2516, subd [2]). The question so raised poses a novel application of the doctrine of Federal pre-emption.
Congress, in enacting title 3 of the Omnibus Crime Control and Safe Streets Act of 1968, relied upon the broadest reach of its commerce clause powers, in large part to impose upon the States the minimum constitutional criteria for electronic surveillance legislation mandated by Berger v New York (388 US *763 41) and Katz v United States (389 US 347).[8] But the legislative intent was not to supersede State regulation of these matters entirely; the grant of enabling power to the States in section 2516 makes this much clear.[9] For the statute recognizes that a State is free to either adopt procedures and standards more restrictive than those imposed by the Federal act or, if it desires, to prohibit wiretapping within its borders altogether (Commonwealth v Vitello, 367 Mass 224; cf. Askew v American Waterways Operators, 411 US 325). On the other hand, under pre-emption principles, any State law drawn more broadly than title 3’s standards runs afoul of the supremacy clause (US Const, art VI, cl 2; see Tribe, American Constitutional Law, p 379). Our inquiry, therefore, focuses on whether the State statute at issue "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” (Hines v Davidowitz, 312 US 52, 66-67; see Savage v Jones, 225 US 501, 533; Nettleton Co. v Diamond, 27 NY2d 182, 190-191). The answer is that it does.
The provisions of title 3 do more than codify bare constitutional requisites; they manifest a Congressional design to protect the privacy of wire and oral communications by confining State authorization for eavesdropping by wiretap to what in Congress’ view are appropriate and compelling circumstances (see Senate Report No. 1097, 90th Cong, 2d Sess, US Code Cong & Admin News, 1968, p 2153). Thus, subdivision (2) of section 2516 carefully enumerates the crimes considered serious enough to warrant investigation by wiretap, namely *764 "murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses” (emphasis supplied).
Its drafters did not keep their intentions secret. The list was to represent a class of major offenses that were either "intrinsically serious or * * * [were] characteristic of the operations of organized crime” (Senate Report No. 1097, p 2234). As is apparent, with the exception of gambling and bribery, the designated crimes all involve harm or the substantial threat of harm to the person, a "limitation [expressly] intended to exclude such offenses as fornication and adultery” from the permissible scope of electronic surveillance (id., at p 2187). Further, the ejusdem generis rule dictates that the general phrase "other crime dangerous to life [or] limb”, since it follows words of a particular meaning, is to be construed as applying only to crimes of the same kind as those precisely stated (see People v Illardo, 48 NY2d 408, 416; McKinney’s Cons Laws of NY, Book 1, Statutes, § 239; Black, Interpretation of Laws, p 141). It is also not irrelevant to observe that a narrow reading is in harmony with our own sensitivity to the dangers inherent in electronic eavesdropping (see People v Washington, 46 NY2d 116, 121-122).
Nevertheless, even cursory examination of New York’s wiretapping provisions reveals that the range of crimes in which electronic interception is permitted is much more encompassing than the Federal standard would seem to admit (Pitler, New York Criminal Practice Under the CPL, p 513). However, that does not alter the fact that the bases for the eavesdropping warrant in this case — allegations of sexual abuse and the promotion of prostitution — however, violative of New York criminal law, do not come within the intendment of the Federal statute because they cannot be said to be "crime[s] dangerous to life [or] limb”. Furthermore, while it is possible for such crimes to involve the use of forcible compulsion (see Penal Law, § 130.65), the State wiretapping statute is not framed with this particularity (see CPL 700.05, subd 8, pars [b], [h]),[10] and there was no indication from which the police *765 could have reasonably suspected that Shapiro’s alleged criminality partook in any measure of either violence or coercion.
In fact these criminal activities involved only consensual conduct, to which, as already indicated, the legislative history tells us the Federal statute does not extend the reach of permissible wiretapping (see Senate Report No. 1097, 90th Cong, 2d Sess, US Code Cong & Admin News, 1968, p 2187). That State law deems persons less than 17 years old "incapable of consent” (Penal Law, § 130.05, subd 3, par [a]) does not catapult these criminal acts into the status of "crimes dangerous to life [or] limb”. Nor, of course, may any claim that our own State Legislature has determined that such acts presented a substantial danger to life and limb override the considered judgment of Congress that they did not.
By this we do not in the slightest mean to suggest that the State’s interest in prescribing criminal penalties for participation with minors in acts of prostitution or sexual abuse is not a strong or even compelling one, or that wiretapping may not be authorized in conformance with the supervening Federal standard where similar acts are undertaken by means of force. But the standard may not be expanded beyond the contemplation of the drafters to include within its sweep more subtle forms of personal injury, for example, any deleterious psychic consequences to minors that may result from their participation in such practices. Thus, under the circumstances of this case, to the extent that CPL 700.05 was read to permit authorization of the wiretaps for crimes not involving the use of force or, indeed, any danger to life or limb, it contravened the requirements of section 2516 of the Federal statute. The wiretaps, therefore, were invalid and the evidence gleaned from them should accordingly have been suppressed (Omnibus Crime Control and Safe Streets Act of 1968, tit 3, § 801, subd [b], 82 US Stat 211; see Lee v Florida, 392 US 378, 385-386).* [11]
*766 For all these reasons, the order of the Appellate Division should be reversed and the case remitted to the County Court, Westchester County, for further proceedings.

. His conviction was affirmed by the Appellate Division, although the judgment was modified to reduce the maximum term of imprisonment from 12 to 7 years and to provide that the sentences should run concurrently (67 AD2d 958).

. That commonly held behavioral prejudices about those who perpetrate sex crimes, mistakingly assuming that the commission of one type of sex crime predisposes to another kind, are often unfounded has been well documented (see, generally, Best, Crime and Criminal Law in the United States, pp 283-288; Leppmann, Essential Difference between Sex Offenders, 32 J Grim L and Criminology 366, 374-380; De River, The Sexual Criminal, A Psychoanalytical Study, pp 274, 277; Report of Mayor’s Special Committee for the Study of Sex Offenders, pp 91-92 [New York City, 1941]; State Department of Mental Hygiene, Report of Study of 102 Sex Offenders at Sing Sing Prison [New York State, 1950]).

. Indeed, at the conclusion of the People’s case, the Trial Judge dismissed 31 of the counts on the ground that there had been no corroboration of the victims’ testimony (see Penal Law, § 130.16).

. The only other eyewitnesses to the evening’s events were defendant himself, who elected not to take the stand, and Senn, who, it is conceded, at the time of trial was confined to a mental institution with a condition that made him unavailable to either side.

. By the time of Shapiro’s trial, Shomer had been convicted, for his participation in the January 31 episode, of promoting prostitution and endangering the welfare of a minor, and had exhausted all appeals. Dowling, for his part, had been convicted of endangering the welfare of a minor but acquitted of all other charges and took no appeal. As for Gary F., his testimony at the Grand Jury had conferred upon him transactional immunity (see CPL 190.40, subd 2), and because of his age, he could not be criminally liable for any of the charges (see Penal Law, § 30.00).

. That Gary F.’s testimony was likely to be materially at odds with his statements before the Grand Jury emerges from this colloquy:
Gary F.’s counsel: "Let’s assume he takes the stand and he tells the truth now, but he lied in the Grand Jury.”
District Attorney: "You’re forcing him at this point in time to commit a crime.”

. Defendant’s solitary witness was the police surgeon who, upon examining Duane S. on the evening in question, found no evidence of a completed act of sodomy.

. The electronic device placed on Shapiro’s telephone, for example, obviously falls within the ambit of Congress’ power to regulate commerce inasmuch as its installation put the New York authorities in a position to intercept local as well as interstate calls made to and from Shapiro’s home.

. The section at subdivision (2) provides: "The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.”

. CPL 700.05 (subd 8, par [b]) only specifies sexual abuse in the first degree as a ground for an' eavesdropping order. This crime is defined in terms of
"subjecting] another person to sexual contact:
*765 "1. By forcible compulsion; or
“2. When the other person is incapable of consent by reason of being physically helpless; or
"3. When the other person is less than eleven years old” (Penal Law, § 130.65).
There appears no basis on which the police could justifiably have believed Shapiro’s misconduct fell within the embrace of any of these three meanings.

. The dissent draws heavily on dicta in Schwartz v Texas (344 US 199), a case subsequently overruled (Lee v Florida, 392 US 378), to argue that the Federal wiretapping statute cannot, consistent with the Tenth Amendment, proscribe the use of evidence in State courts merely because that evidence was obtained by means outlawed by the wiretapping statute rather than by the Constitution itself.
*766 Schwartz held that a State court was not impelled to reject evidence garnered in violation of section 605 of the Federal Communications Act of 1934, the predecessor of title 3, even though the statute had been judicially construed to require such exclusion in the Federal courts (see Nardone v United States, 302 US 379). However, in overruling Schwartz in Lee v Florida (supra), the Supreme Court recognized Schwartz’ rationale to be at odds with Mapp v Ohio (367 US 643) which, according to the court, "imposed a judicially devised exclusionary rule in order to insure that a State could not adopt rules of evidence calculated to permit the invasion of rights protected by federal organic law” (392 US, at p 385). As the court in Lee correctly noted, it was the supremacy clause that forbade any court, State or Federal, from "servftng] as an accomplice in the willful transgression of 'the Laws of the United States’, laws by which 'the Judges in every State [are] bound’ ” (392 US, at p 386; see, also, Flaherty v Arkansas, 415 US 995, 996-997, n 3 [Douglas, J., with Brennan and Marshall, JJ., dissenting from denial of certiorari]).