Titone, J.
(dissenting). The majority’s decision to uphold the provision of CPL 700.05 (5) authorizing eavesdropping warrant applications by the Director of the Organized Crime Task Force (OCTF) is not supported by the language of the governing Federal statute (18 USC § 2516 [2]), the underlying statutory purpose or the relevant case law. Moreover, the majority’s broad-brush approach, which is based largely on the general crime-prevention goals of the two statutes and on an attempted analogy to the provisions governing warrant applications by Federal law enforcement officials, is flatly inconsistent with the "narrow reading” of the Omnibus Crime Control *443 Act that we have previously adopted because of "our own sensitivity to the dangers inherent in electronic eavesdropping” (People v Shapiro, 50 NY2d 747, 764). Since I cannot subscribe to what I consider to be the majority’s strained efforts to uphold the challenged statute, I respectfully dissent.
Under the Omnibus Crime Control Act, only two classes of law enforcement officers may be designated by the States as proper applicants for court-authorized electronic eavesdropping warrants: the State’s "principal prosecuting attorney” and the "principal prosecuting attorney of any political subdivision [of the State]” (18 USC § 2516 [2]). The language is plain and unambiguous. Giving it its most natural reading, the statutory language denotes a single individual, more particularly the individual entrusted, by the State as a whole or by each of its political subdivisions, to oversee the People’s interest in the prosecution of crime. In the words of the Senate Report on the then-proposed statute, it was "the chief prosecuting officer of the State” that Congress had in mind (Sen Rep No. 1097, 90th Cong, 2d Sess, 1968, reprinted in 1968 US Code, Cong & Admin News 2112, 2187 [hereinafter Senate Report]). Although allowance was made for warrant applications by "the principal prosecuting attorney at the next political level of a State,” e.g., the county, the provision "d[id] not envision a further breakdown” (id.).
Thus, under both the unadorned statutory terms and the official explanation of how those terms were intended to be used, it is abundantly clear that Congress did not intend to permit the authority to apply for electronic eavesdropping warrants to be split between two different prosecuting officials both of whom operate at the State level of government. CPL 700.05 (5), which permits applications by either the State Attorney-General or the OCTF Director, who are both State-level prosecuting attorneys, is therefore not in conformity with 18 USC § 2516 (2) and, for that reason, cannot be sustained (see, People v Shapiro, supra).
The majority’s position is not advanced by its assertion that "under New York’s unconventional scheme * * * the Attorney-General is not traditionally or by statutory empowerment a general prosecuting official” (majority opn, at 441). Indeed, the "unconventional scheme” that the majority posits was expressly contemplated by the drafters of the Senate Report: "In most States, the principal prosecuting attorney of the State would be the attorney general. The important question, *444 however, is not name but function. The intent of the proposed provision is to provide for the centralization of policy relating to statewide law enforcement in the area of the use of electronic surveillance in the chief prosecuting officer of the State. Who that officer would be would be a question of State law. Where no such office exists policymaking would not be possible on a statewide basis; it would have to move down to the next level of government. In most States, the principal prosecuting attorney at the next political level of a State, usually the county,, would be the district attorney, State’s attorney, or county solicitor. ” (Senate Report, at 2187 [emphasis supplied].) Thus, if the majority’s assertion were true, it would lead only to the conclusion that the Attorney-General is not a proper designee under 18 USC § 2516 (2). It certainly does not support the proposition that the OCTF Director, whose jurisdiction is even narrower than the Attorney-General’s, is fairly characterized as "the chief prosecuting officer of the State” or its functional equivalent (see, majority opn, at 439).
Even apart from the clear import of the statutory language and legislative history, it is apparent that CPL 700.05 (5)’s designation of the OCTF Director as a permissible applicant is inconsistent with the goals of the Federal act. Again, according to the Senate Report, "[t]he intent of the proposed provision [18 USC § 2516 (2)] is to provide for the centralization of policy relating to statewide law enforcement in the area of the use of electronic surveillance in the chief prosecuting officer of the State” (Senate Report, at 2187 [emphasis supplied]). The purpose of such centralization, in turn, was to "avoid the possibility that divergent practices might develop” (id., at 2185).[1]
*445 Plainly, the concept of "centralizing” the authority to apply for eavesdropping warrants in a "chief prosecuting attorney” is inconsistent with allowing applications at the State level to be made by either the Attorney-General or the OCTF Director. Similarly, it is difficult to see how the goal of avoiding divergent practices may be reconciled with a State statute that permits decisions "in the area of the use of electronic surveillance” to be made in two separate offices having two separate sources of authority. In this regard, it is important to point out that although the OCTF Director operates nominally within the Attorney-General’s office, he is, as the Appellate Division noted below, "vested [with] the authority to act with relative independence in conducting investigations within his jurisdiction” (144 AD2d, at 54). Indeed, the Director’s own brief submitted on this appeal asserts that his power to investigate cases involving organized crime "is derived directly from the various provisions of section 70-a of the Executive Law [the enabling legislation], and not from delegation by the Attorney-General.” In light of the specialized mandate of the OCTF Director and the absence of direct accountability between the Director and the Attorney-General, it seems likely that the former’s priorities and policy choices will differ from those of the regular law enforcement officials within the latter’s office, leading to precisely the type of conflicting and "divergent” practices that Congress was seeking to prevent.[2]
The majority’s heavy reliance on the parallel provisions governing Federal warrant applications (majority opn, at 439) is also misplaced. It is true, as the majority notes, that 18 USC §2516 (1) authorizes warrant applications by a number of high-level Federal officials (see also, DC Code Annot § 23-546 [a] [including as permissible applicants the United States *446 Attorney or any designated "investigative or law enforcement officer”]).[3] However, the listed officials were selected by Congress specifically because there were "lines of responsibility lead[ing] to an identifiable person” (Senate Report, at 2185). Further, as noted by the United States Supreme Court, the listed officials, all appointed directly by the President of the United States, can fairly be said to be "responsive to the political process” (United States v Giordano, 416 US 505, 520). The same cannot be said about the OCTF Director, who is appointed jointly by both the Governor and the Attorney-General (Executive Law § 70-a [2]). Contrary to the majority’s assertion (majority opn, at 440), this system of joint appointment does not promote political accountability, but rather operates to insulate the OCTF Director from direct accountability to the political process precisely because it splits "the lines of responsibility” between two, separately elected appointing authorities.[4]
Finally, unlike the majority, I am not persuaded by the supposed consonance between the purpose of section 2516 (2) of the Federal Omnibus Crime Control and Safe Streets Act and that of New York State legislation creating the Organized Crime Task Force (Executive Law § 70-a). The purpose of the latter was to enhance the State’s law enforcement capabilities by centralizing law enforcement efforts in a particular class of cases, i.e., those involving organized crime, in a single prosecutorial entity (see, Legislative Findings, L 1970, ch 1003, § 1). The purpose of the former, in contrast, was to minimize the potential for prosecutorial abuse of electronic eavesdropping by centralizing the warrant application authority in a single, politically responsible official. The only point of commonality is that the statutes’ respective goals are to be accomplished through centralization. Such a superficial common ground is certainly not sufficient to bring CPL 700.05 (5) into compliance with the controlling Federal statute.
*447 The implications of the majority’s reliance on the "centralization” factor are profound and disturbing. Because centralized administration of law enforcement is often considered more effective than local prosecutorial efforts, with their inherent boundary restrictions, there is a perceptible recent legislative trend toward creating specialized prosecutors, whose authority transcends local borders, to address particular types of crimes. Given this trend, the majority’s approval of the statutory provision at issue here creates a very real risk that in the future there will be a proliferation of special-interest prosecutors who are legislatively authorized to obtain electronic eavesdropping warrants. The office of the Special Narcotics Prosecutor for New York City, for example, has some of the same salient characteristics as the OCTF Director, in that it too was created because of a perceived need to "centralize” law enforcement efforts in an area of urgent concern, i.e., drug trafficking (see, Judiciary Law § 177-a). Further, like the OCTF Director, the Special Narcotics Prosecutor operates nominally within the office of a conventional prosecutorial authority (a District Attorney serving one of the counties within New York City), but is collectively appointed by — and therefore responsible to — several elected officials, namely, the District Attorneys of all five of the counties within New York City (Judiciary Law § 177-c). Under the majority’s rationale, these traits would seem to render the Special Narcotics Prosecutor as eligible for designation as a permissible eavesdropping warrant applicant as the OCTF Director.
In summary, as I read the language and published legislative history of 18 USC § 2516 (2), for State-level investigations, the States are limited to designating a single prosecutorial official, specifically, their chief prosecuting officers, to apply for electronic eavesdropping warrants. Permitting multiple designations at the State level of special-interest prosecutors such as the OCTF Director, whose functions are "centralized” by subject matter, is inconsistent with the Federal goal of centralizing the policy and practices "in the area of the use of electronic surveillance” without regard to the subject matter of the investigation (Senate Report, at 2187). For that reason, I conclude that CPL 700.05 (5)’s designation of the OCTF Director cannot be upheld under the doctrine of Federal preemption (see, People v Shapiro, supra).
While I would reverse and suppress all of the electronically *448 acquired evidence primarily because of the OCTF Director’s reliance on an unconstitutional source of authority, I cannot help but comment on defendant’s other argument for suppression, i.e., the People’s failure to comply with the statutory sealing requirements (CPL 700.50). The majority has held that the delays in sealing here were acceptable not because of any reasonable excuse offered by the prosecutor, but rather because, in contrast to the circumstances in People v Winograd (68 NY2d 383), "the prosecutor [here] made alternative arrangements in advance with court approval” (majority opn, at 442). I cannot agree, however, that the statutory requirement of prompt sealing may be waived or dispensed with upon judicial approval (see, Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 700.50, at 504 [distinguishing between issuing Judge’s broad discretion to require progress reports and mandatory nature of return and sealing requirements]). Plainly, People v Edelstein (54 NY2d 306), on which the majority relies, cannot be considered helpful in light of the limitations that were placed on that case’s significance in People v Basilicato (64 NY2d 103, 116-117) and People v Winograd (supra, at 389-395). Indeed, to the extent that Edelstein may be construed to permit delays in sealing occasioned solely by the issuing Judge’s unavailability, it has been superseded by the holding in Winograd, which required the People to "offer [an] explanation for their failure to have the supervising Justice transfer authority to an available Justice” (68 NY2d, at 394, supra). Whether permission or approval by the issuing Judge is a sufficient "explanation” is not answered by either Edelstein or Winograd. As a matter of common sense, however, it seems to me that if an unexcused prosecutorial delay in bringing tapes to be sealed would constitute a ground for suppression in a given case, a judicial directive permitting such delay would also be error necessitating suppression.
Accordingly, I dissent and cast my vote to reverse the orders of the Appellate Division and suppress the evidence obtained as a result of electronic surveillance.
Chief Judge Wachtler and Judges Simons, Kaye and Hancock, Jr., concur with Judge Bellacosa; Judge Titone dissents and votes to reverse in a separate, opinion; Judge Alexander taking no part.
In each case: Order affirmed.

. Contrary to the majority’s suggestion, the argument that the statute contemplates only one official at each level of local government does not turn on the drafters’ use of the definitive article "the” (majority opn, at 438). To the contrary, the very concept of "centralizing” authority, which figured so prominently in the drafters’ intentions, denotes a singular point of authority. I would also note that the majority’s own reliance on the grammatical construction that the Senate Report drafters used in urging that States should "specifically designate the principal prosecuting attorneys empowered to authorize interceptions” (Senate Report, at 2187 [emphasis supplied]; see, majority opn, at 439) is unavailing. Since 18 USC § 2516 (2) permits designation of "principal prosecuting attorneys” at both the State and political subdivision levels of government, the use of the plural term "principal prosecuting attorneys” is, in this context, hardly surprising. Certainly, it does not support the majority’s conclusion that more than one "principal prosecuting attorney” at the State level of government was contemplated.

. The majority relies, in part, on "the requirement of authorization running to the Director from the regularly elected Attorney-General” (majority opn, at 440). However, as the majority later acknowledges, once such authorization is received, the Director’s powers are "independent” and not "derived” (majority opn, at 441). Furthermore, the authorization contemplated by CPL 700.05 (5) is not given on a case-by-case or application-by-application basis. Rather, it is a blanket authorization empowering the OCTF Director to apply for electronic eavesdropping warrants in those cases falling within his statutory jurisdiction. Thus, the important discretionary decisions, such as when to make applications and how to administer the wiretapping program within his department are left to the Director, without regard to whether the underlying policies conflict with those followed in the investigative branch of the Attorney-General’s office.

. 18 USC § 2516 (1) provides that electronic eavesdropping warrant applications may be made by "[t]he Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General or any [specially designated] Deputy Assistant Attorney General in the Criminal Division”.

. The split in the lines of accountability is particularly significant in our State, where the offices of Governor and Attorney-General have often been held by members of different political parties or by individuals with very different political viewpoints. Further, the independence of the New York State Attorney-General vis-á-vis the Governor is a well-known and long-standing tradition.