THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
THOMAS STREITFERDT, Appellant.

First Department, July 2, 1991

## APPEARANCES OF COUNSEL

*Mark M. Baker* of counsel *(Barry Ivan Slotnick, Michael Shapiro* and *Lori E. Mann* with him on the brief; *Slotnick & Baker,* attorneys), for appellant.

*Hillary Hassler* of counsel *(Mark Dwyer* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

ROSENBERGER, J.

Defendant, the pastor of The True Church of God in East Harlem, was charged with various counts of sexual misconduct stemming from complaints made by former female members of his congregation. Counts relating to one of the complainants were dismissed on the People's motion prior to trial. The remaining counts of the indictment were premised on the theory of forcible compulsion as they related to two of the complainants and on a theory of inability to consent by reason of age as they related to another complainant. Defendant's

motion for a severance of the counts relating to each complainant was denied.

One of the complainants, a church member since 1971, testified that after a Sunday service in May of 1985, she was notified that defendant wanted to see her. When she arrived at his office in the basement of the building, defendant told her that one of the other members of the church wanted to date her. After discussing her abstention from sexual relations, defendant pulled her toward him and fondled her. Although she resisted, defendant also began to kiss her. The complainant told other church members, including her sister, about the incident with the pastor, but continued to attend church functions since her son was still an active member of the congregation.

In August, defendant again requested to see this complainant in his office. He told her to close the door and sit down, and then asked her how many people she had told about the earlier incident. When she told him that she had only informed her sister, defendant told her that she was not going to get in his way and that if anyone was going, it was her. He also said that no one would believe her story. When she got up to leave, defendant pulled her to him, tried to kiss her and fondled her breasts. She finally broke free and as she was leaving, defendant told her to smile. Other church members and former church members confirmed that this complainant had told them about her meetings with defendant.

In September, defendant "disfellowshipped" this complainant and her sister and had them escorted out of church. According to church rules, a disfellowshipped member is not allowed to attend church or to associate with other church members, including members of their own family. After the complainant and her sister were escorted out, defendant continued his sermon on kissing. He then asked "who is on the Lord's side come unto me" at which time the congregation formed a line and defendant embraced and kissed everyone on the lips.

Another complainant, a church member for five years, was 16 years old when she made an appointment to speak to defendant in the latter part of the summer of 1986. After discussing school and her family, defendant asked her about her sexual activities. He told her that he would be her father figure since her own father did not attend The True Church of God, then kissed her and put his tongue in her mouth.

When this complainant went to see defendant again, to discuss the church's tithing policy, which required each member to donate a certain percentage of their annual earnings to the church, he asked her to sit on his lap. As he repeated his intention to be her father figure, defendant put his hand under her skirt and fondled her. He then told her that he wanted to be her sexual release and inserted his finger into her vagina. Defendant warned her that if she told anyone what happened, no one would believe her and that he would disfellowship her. Defendant then kissed her and put his tongue in her mouth before she left.

On February 15, 1987, a member of the church asked defendant for permission to date this complainant. Defendant sent for her and, after telling her that he approved of her dating, told her to stand up so that he could see her legs. He then pulled up her dress, led her to the floor and had intercourse with her. She stated that defendant began making racial slurs toward her and forced her to commit sodomy. She got dressed but before she left, defendant told her not to worry because when she got married, he would teach her how to move her hips a certain way so her husband would think she was still a virgin. Defendant again warned her not to tell anyone because no one would believe her. She and her family were also disfellowshipped by defendant.

A third complainant attended premarital counseling courses conducted by defendant's wife, during the summer of 1986. One evening, defendant summoned her to his office and locked the door behind her. After discussing her wedding plans, defendant asked if she was ready. When she told him that she was confused by what he meant, he grabbed her arm, told her she knew exactly what he meant and dragged her to the center of the room. After calling her a "black bitch" and telling her that she needed a release, defendant forced her to the floor and raped her. When defendant called her to his office a few weeks later, he expressed remorse for hurting her and told her that he was just trying to do the fatherly thing.

In an attempt to counter these allegations, defense counsel repeatedly requested permission to ask various witnesses whether they knew of the complainants' reputations for truthfulness and veracity. Specifically, defense counsel informed the court that he intended to ask the witnesses the following questions: "Have you had an opportunity to discuss with other members of your community the reputations of the complainants for truthfulness and veracity?" Based upon these discus-

sions, "what is your understanding of their reputations for truthfulness and veracity?" "Based on your knowledge of these reputations, would you believe the complainants even if they testified under oath?" The court denied the applications.

The defense called defendant and various members of his family, who also worked at the church. They testified to the layout of the various offices located in the basement of the church and to the ability to hear conversations within defendant's office. Defendant denied the allegations made by the complainants. Other church members who attended the premarital instruction course with the third complainant, testified that she never missed nor arrived late to any of the classes. Other testimony was introduced to establish that two of the complainants went to defendant's office after the purported rapes, that one was photographed after the incident in a dress she had claimed she had changed out of and that another complainant never commented on defendant's behavior to his daughter, as she testified, upon leaving defendant's office. Defendant was convicted of all of the counts relating to two of the complainants but was acquitted of the more serious counts of the indictment pertaining to the complainant who was only sixteen years old at the time of the purported attack. Defendant's motion to set aside the verdict was denied.

■ Defendant correctly contends that the trial court committed reversible error when it precluded testimony which sought to establish that the complainants had bad reputations for truth and veracity. It is well-settled that "a party has a right to call a witness to testify that a key opposing witness, who gave substantive evidence and was not called for purposes of impeachment, has a bad reputation in the community for truth and veracity." *(People v Pavao,* 59 NY2d 282, 290; *People v Carlo,* 46 AD2d 764.) The trial court's refusal to allow the introduction of such testimony in effect denied the jury the opportunity to test and assess the credibility of all the witnesses at this trial, where credibility was the central issue.

■ In denying defendant's motion to set aside the verdict, the trial court reasoned that the witnesses were not qualified to attest to the complainants' bad reputations for honesty because they, presumably, were still active members of The True Church of God and were antagonistic toward the complainants, who had been disfellowshipped, and whose allegations led to the arrest of their spiritual leader. This conclusion, however, usurped the jury's function, which was to determine the credibility of the witnesses. The prosecutor

readily could have brought any purported bias on the part of the witnesses to the jury's attention.

Contrary to the People's contention, the introduction of the proposed testimony would not have created "collateral mini-trials" involving the accuracy of each witness' answers *(People v Pavao, supra,* at 289). Defense counsel was not seeking to contradict specific answers given by a witness. Rather, he merely sought to demonstrate that the complainants had bad reputations in the community for truth and veracity. Since the credibility of the witnesses was key to the jury's determination of the charges submitted, precluding the reputation evidence was not harmless error.

■ In ordering a new trial, we further note that it was not an improvident exercise of discretion for the trial court to have denied defendant's motion for a severance (CPL 200.20 [3]; *People v Lane,* 56 NY2d 1; *People v Telford,* 134 AD2d 632, *lv denied* 71 NY2d 903; *cf., People v Shapiro,* 50 NY2d 747). Trial courts must be afforded reasonable latitude in exercising discretion in these matters and in doing so, must weigh the public interest in avoiding duplicative, lengthy and costly trials against defendant's right to a fair trial free of undue prejudice *(People v Lane, supra).*

Contrary to the conclusion reached by the dissent, there is no basis in the record to support the assertion that defendant suffered prejudice as a result of the denial of his severance application. The indictment at the time of trial contained only six counts. Those counts were not so numerous as to tempt the jury to view the evidence cumulatively and to convict defendant based on a perception that he was prone to commit the sort of offenses charged in the indictment *(People v Peterson,* 42 AD2d 937, *affd* 35 NY2d 659; *cf., People v Shapiro, supra).*

The proof of each crime was presented separately *(see, People v Hall,* 169 AD2d 778; *People v McNeil,* 165 AD2d 882, *lv denied* 76 NY2d 988; *People v Hoke,* 96 AD2d 677). The court also carefully instructed the jury to consider the evidence of each incident separately *(People v Hall, supra; People v Telford, supra).* The fact that the jury acquitted defendant of the more serious charges alleged by the underage complainant demonstrates that they were able to segregate the evidence as it related to each count of the indictment *(People v Hall, supra; People v Peterson, supra).* Nor does the fact that crimes of a sexual nature were involved in each incident provide a sufficient basis for a severance *(People v Hall, supra; People v*

*McNeil, supra; People v West,* 160 AD2d 301, *lv denied* 76 NY2d 798; *People v Pierce,* 141 AD2d 864, *lv denied* 72 NY2d 923; *People v Telford, supra).*

In light of our determination, we do not reach defendant's remaining contentions.

Accordingly, the judgment of the Supreme Court, New York County (Franklin Weissberg, J.), rendered July 7, 1989, convicting defendant, upon a jury verdict, of rape in the first degree, sexual abuse in the first degree (two counts) and sexual abuse in the third degree, and sentencing him to consecutive, indeterminate terms of imprisonment of 5 to 15 years on the rape count and 1 to 3 years on the sexual abuse in the first degree counts and to a concurrent definite term of imprisonment of six months on the sexual abuse in the third degree count, should be reversed, on the law, and a new trial ordered.

MURPHY, P. J. (concurring in part and dissenting in part). Although I agree with the majority that the trial court's failure to permit the defendant to present witnesses to testify as to the complainants' reputations in the community for truthfulness constitutes a sufficient predicate for reversal *(People v Pavao,* 59 NY2d 282), I cannot agree with the majority that the defendant's motion for severance was properly denied.

As is set forth more fully in Justice Rosenberger's opinion, this was a case in which three complainants alleged that they had separately been the victims of various sex offenses committed by the defendant. The earliest of these offenses was said to have occurred in May of 1985 and the latest in February of 1987. The authorities, however, received no report of any offense until March 1988 when one of the complainants made widely publicized allegations against the defendant; the two other complainants made their allegations a short time later. At the time of the alleged incidents all of the complainants were members of The True Church of God, the religious organization over which the defendant presided as pastor; by the time of their criminal complaints, however, all of the complainants had been expelled or "disfellowshipped". It is clear that the complainants knew of each others' allegations and, on occasion, socialized as members of a group of "disfellowshipped" congregants. The complainants uniformly alleged that they had been sexually assaulted in varying degrees by the defendant in the defendant's office at the church. Their

accounts of the defendant's behavior, and particularly of his statements during his commission of the alleged offenses were remarkably similar and in some respects identical.

The charges of all three complainants were joined in a single indictment which, by the time of trial, contained six counts. Although the charges were properly joined pursuant to CPL 200.20 (2) (c) which provides that offenses are joinable when they are "defined by the same or similar statutory provisions and consequently are the same or similar in law", it is clear that counts joined under this paragraph may still be severed pursuant to CPL 200.20 (3) which provides that "[I]n any case where two or more offenses or groups of offenses charged in an indictment are based upon different criminal transactions, and where their joinability rests solely upon the fact that such offenses, or as the case may be at least one offense of each group, are the same or similar in law, as prescribed in paragraph (c) of subdivision two, the court, in the interest of justice and for good cause shown, may, upon application of either a defendant or the people, in its discretion order that any such offenses be tried separately from the other or others thereof."

It is clear that the reason for providing for the severability of counts joined pursuant to CPL 200.20 (2) (c) is that the offenses joined under that authority, by hypothesis, do not arise out of the same facts and are not provable by the same facts. Their joinder then, solely by reason of their legal similarity, raises the possibility that the jury will be exposed to proof of numerous offenses, which although factually distinct, may seem similar because they are of the same legal type, involve the same defendant and because they may on occasion actually be quite similar in the details of their commission. There will, in these circumstances, doubtless be cases in which the jury will find it difficult to keep the evidence relevant to each count properly segregated. Indeed, there will be situations in which the jury will be sorely tempted to view the evidence offered upon the various counts cumulatively and to convict not upon the evidence relevant to each count but upon the perception generated by the entire body of evidence that the defendant is generally prone to the commission of the sort of offenses charged.

It is very basic that a defendant may not be convicted of one crime based on evidence of other crimes showing no more than an apparent propensity to engage in a particular kind of criminal behavior *(People v Molineux,* 168 NY 264, 291-293;

*People v Alvino,* 71 NY2d 233, 241). And, it is precisely to avoid such convictions, the danger of which may be considerably heightened by joinder pursuant to CPL 200.20 (2) (c), that CPL 200.20 (3) provides for the severance of counts so joined. It is, of course, true that the decision as to whether severance ought to be granted is left to the trial court's discretion. A court's exercise of discretion in this area, however, is reviewable. The basic considerations were outlined by Judge Wachtler writing for the Court of Appeals in *People v Lane* (56 NY2d 1, 8): "Trial courts should generally weigh the public interest in avoiding duplicative, lengthy and expensive trials against the defendant's interest in being protected from unfair disadvantage. While the trial courts must be afforded reasonable latitude in exercising discretion in these matters, we emphasize that compromise of a defendant's fundamental right to a fair trial free of undue prejudice as the *quid pro quo* for the mere expeditious disposition of criminal cases will not be tolerated".

It would seem plain that in the present case the defendant's fundamental right to a fair trial was impermissibly compromised by the denial of severance. The entire case against the defendant lay in the testimony of the complainants as to what they had suffered. The defense was quite simply that the alleged offenses had never occurred. Thus, as the majority has recognized "credibility was the central issue". In this context, it was enormously prejudicial to allow the allegations of each of the three complainant's to be placed before the same jury. The picture which emerged from the complainants' combined testimony was one of a religious leader who had over a 21-month period repeatedly abused his spiritual and moral authority to prey sexually on the women of his congregation. As noted, all of the attacks upon the complainants were said to have occurred in the defendant's church office and to have been marked by similar, if not identical, behavior and statements; particularly notable were the complainants' reports of the defendant's use of racial epithets, his explanations of his conduct as fulfilling a "fatherly duty" and providing a "sexual release", and his repeated idiomatic references to his anatomical superiority. The danger that the jury would convict on each count based on this entire body of evidence, the cumulative effect of which was to depict a man characteristically prone to sexual depredation and possessed of a vengeful and otherwise abusive disposition would have been overwhelming.

Contrary to the People's appellate arguments, there is no

evidentiary theory which would have permitted the jury to consider the testimony of more than one of the complainants as probative of any single count of the indictment. Thus, had severance been granted segregating the counts relating to each complainant from the remaining counts, the evidence of defendant's extensive career of sexual assaults upon his congregants would never have come to the jury's attention. The danger then of a guilty verdict based on evidence of other crimes, would have been effectively avoided.

Joinder, particularly joinder pursuant to CPL 200.20 (2) (c), cannot be permitted to be used as a device to circumvent the general prohibition against proving one crime by introducing evidence of the defendant's commission of others. If evidence of the various offenses with which the defendant was charged had been material and admissible upon each count of the indictment pursuant to one of the exceptions to the general rule against evidence of other crimes (see, People v Molineux, supra, at 293), joinder would have been accomplished pursuant to CPL 200.20 (2) (b) rather than 200.20 (2) (c). CPL 200.20 (2) (b), of course, provides specifically that offenses are joinable when "proof of the first offense would be material and admissible as evidence in chief upon a trial of the second, or proof of the second would be material and admissible as evidence in chief upon a trial of the first". Joinder pursuant to CPL 200.20 (2) (c), on the other hand, which is what we deal with here, is appropriate only when the offenses to be joined are "not joinable pursuant to paragraph (b)" (CPL 200.20 [2] [c]; see also, CPL 200.20 [3]). Indeed, defendant's entire trial was conducted, at least in theory, upon the understanding that the joinder of the counts had no evidentiary justification, but had been permitted solely in the interests of judicial economy and prosecutorial convenience. The court's charge which the People cite approvingly instructed:

"[t]he People have joined a number of separate incidents in one indictment. The indictments are joined for convenience and in the interest of judicial economy. Bear in mind that each of the charges which I am submitting to you alleges a separate crime. The fact that the defendant is charged with one crime is not evidence that he committed another crime also charged.

"Therefore, you are required to separate in your minds the evidence applicable to each of the crimes and to return a verdict on each crime alleged, based solely on the evidence

applicable to that crime. You are to treat this case as three separate trials."

Having proceeded on this basis without objection to this point, it is rather late in time for the People to contend as they do in their appellate argument that joinder pursuant to CPL 200.20 (2) (b), which they term *"Molineux* joinder", would have been permissible. In any event, it would not have been permissible.

Although the People now urge that the testimony of all three complainants might have been admitted in proof of each offense to rebut what they freely characterize as the defendant's claim that the complainants were mistaken in their perception of his behavior, it is absolutely clear that no such claim was made by the defendant. As noted, the defense was quite simply that the sexual assaults alleged by the complainants had never occurred; indeed, assuming that the assaults had occurred as alleged there was no viable defense that they had been innocently performed, except perhaps that the victims capable of consenting had done so, but consent was not raised as a defense at trial.

In the end it is the People in their belated attempt to demonstrate the availability of *"Molineux* joinder" who most accurately capture the dynamic of the other crimes evidence in this case: "these sexual acts [the defendant's] each bore the distinct oddities of defendant's criminal signature and the mere repetition of them negated the likelihood (pressed ardently by defendant at trial) that none of them happened at all." Of course, once it is admitted that an act has been repeated, it goes without saying that the act has occurred, not merely once, but at least twice. This, however, puts the cart before the horse, for the proper question for the jury in its consideration of each count was not whether the defendant, having committed some of the offenses with which he was charged, was likely to have committed others, but whether he had committed any offense at all. Contrary to the People's assertion, a defendant's commission of other similar offenses, even if independently established, does not logically make it more likely that the offense to be proved has in fact been committed by the defendant *(see,* 1A Wigmore, Evidence § 55.1, at 1160 [Tillers rev ed]). That likelihood may only be said to increase if the other crimes evidence is received as evidence of the defendant's propensity *(ibid.)* and that is exactly what *Molineux* and its progeny *(see, e.g., People v*

*Crandall,* 67 NY2d 111, 118; *People v Hudy,* 73 NY2d 40, 54-55) prohibit.

The great difficulty with this case is that despite the trial court's above-quoted admirably clear instructions as to the separate relevance of each of the complainants' evidence, it is an exercise in pure fiction to suppose that the jury would not have considered the evidence in precisely the manner suggested by the People, namely, that because the defendant had repeatedly committed sexual assaults upon the women of his congregation the likelihood was that he was predisposed to do so and had done so on each of the occasions charged. Even the prosecutrix found it all but impossible to refrain from viewing the counts in isolation, and in her summation repeatedly sought to buttress the credibility of her witnesses by highlighting the similarity of their accounts—by arguing in essence that the complainants must be telling the truth because the things to which they attested were just the sort of things that the defendant did. A few examples will suffice:

"And just as he had tried with Ms. Campbell, defendant tried to tell her [Kerry Heron] that he was just being fatherly; that he didn't mean to hurt her * * *

"[With regard to Karen Hart] * * * [a]nd then the defendant, just as he had with Ms. Campbell, steered the conversation to sex * * *

"You heard that he began talking to her repetitiously, saying the same things over and over again, just as he had with Ms. Heron * * *

"He penetrated her [i.e., Karen Hart] again, talking all the time the same way he had with Kerry Heron; the same way he had with Elaine Campbell when he kept telling Ms. Campbell 'look up in my face; look up in my face.' To Ms. Hart he was saying 'you know you like this'. He used racial epithets with her and when he withdrew he told Ms. Hart 'lick my penis'. He grabbed her head and pushed her down on him, boasting again, as he had to Ms. Heron, about how large he was and how she had never guessed he was so big by seeing him up on the pulpit".

Finally, in a rather blatant invitation to consider all of the incidents together, the prosecutrix unveiled the following theory to the jury: "[N]ow in feudal times, the lord of the land exercised what was known as droit de seigneur ius primum, first night rights. In this case, I submit that is a common thread that runs through all three incidents."

The temptation to this sort of argument and the concomitant risk of convictions based upon highly prejudicial evidence of other crimes which should never have been considered by the jury, ought to have been removed at the outset by means of severance. It is hard to imagine a case in which the court's discretion to sever pursuant to CPL 200.20 (3) would have been more appropriately exercised or one in which the failure to do so would more sharply compromise a defendant's fundamental right to a fair trial free of undue prejudice.

Accordingly, while I agree that a reversal of the defendant's convictions is required for the reasons set forth in the majority opinion, I believe it to be additionally required by the trial court's improvident denial of the defendant's motion for severance.

WALLACH, KUPFERMAN and SMITH, JJ., concur with ROSENBERGER, J.; MURPHY, P. J., concurs in part and dissents in part in a separate opinion.

Judgment, Supreme Court, New York County, rendered on July 7, 1989, reversed, on the law, and a new trial ordered.