People v Gross (2019 NY Slip Op 00461)





People v Gross


2019 NY Slip Op 00461


Decided on January 23, 2019


Appellate Division, Second Department


Sgroi, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 23, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

WILLIAM F. MASTRO, J.P.
CHERYL E. CHAMBERS
SANDRA L. SGROI
JOSEPH J. MALTESE, JJ.


2016-13182
 (Ind. No. 897-12)

[*1]The People of the State of New York, respondent,
v
Ira Gross, appellant.



APPEAL by the defendant from a judgment of the County Court (Richard Ambro, J.), rendered October 26, 2016, and entered in Suffolk County, convicting him of grand larceny in the first degree, attempted grand larceny in the first degree, criminal diversion of prescription medications and prescriptions in the first degree, attempted criminal diversion of prescription medications and prescriptions in the first degree, money laundering in the first degree (three counts), money laundering in the second degree, commercial bribery in the first degree, and conspiracy in the fourth degree, upon a jury verdict, and imposing sentence.

 Garfunkel Wild, P.C., Great Neck, NY (John G. Martin and Daniel Gorman of counsel), for appellant.
 Letitia James, Attorney General, New York, NY (Nikki Kowalski and James F. Gibbons of counsel), for respondent.



SGROI, J.


The defendant was convicted of various criminal charges arising from his role in an operation by which prescription medications for the treatment of HIV and AIDS were purchased from patients and ultimately resold to MOMS Pharmacy to be redispensed to other patients. The evidence against the defendant included recordings of intercepted phone calls obtained by wiretap. This appeal raises the issue of whether, in light of statutory requirements for the sealing of original wiretap recordings, it was error for the trial court to admit into evidence an unsealed compilation recording created from a computer hard drive onto which the conversations were originally recorded. We hold that, since an original recording was properly sealed and preserved in accordance with the applicable statute, it was not error for the trial court to admit into evidence an unsealed compilation recording that was [*2]otherwise properly authenticated. Nevertheless, we further hold that the People failed to present legally sufficient evidence to support the defendant's convictions of grand larceny in the first degree, attempted grand larceny in the first degree, criminal diversion of prescription medications and prescriptions in the first degree, and attempted criminal diversion of prescription medications and prescriptions in the first degree, such that those convictions, as well as his convictions of conspiracy in the fourth degree and money laundering in the first degree (three counts), which were based on the commission of the former felonies, should be reversed and those counts of the indictment dismissed insofar as asserted against the defendant.
The evidence presented by the People established the following facts. At the time of trial, 90% of prescription drugs sold in the United States were supplied by one of three wholesalers—AmerisourceBergen, Cardinal Health, and McKesson—deemed "the big three." Smaller, independent pharmacies that did not have the sales volume to obtain a contract with "the big three" were served by "secondary wholesalers," which generally bought from "the big three" or other secondary wholesalers.
In general, cocktails of drugs used to treat AIDS and HIV patients, which could cost, in total, $3,000 to $4,000 for a one-month supply, could be sold on the black market. Patients, particularly those on Medicaid or Medicare who paid very little or nothing at all for the medications, could sell them on the street to "street diverters." The street diverters aggregated the drugs, removed the labels from the medication bottles, and "cleaned" the bottles by using heat and solvents to remove label residue. They then stored the drugs in places such as sheds, warehouses, and cars, without temperature controls, and reintroduced them into the stream of commerce, usually through secondary wholesalers. According to the testimony of the People's expert, such medications that left the legal distribution system were deemed adulterated, rendering them unfit for resale, as there was no method to ensure that the products were safe and effective. The experts testified that no individual had a "medical need" for adulterated drugs.
In 2008, Stephen Costa approached Ruben Cruz, who was "a big money guy" involved in illegal drug distribution, about becoming involved in Cruz's prescription drug business. Costa thereafter learned the mechanics of "cleaning" medication bottles and set up a licensed wholesale pharmaceutical distributor, SMC Distributors, in Alabama. The plan was for SMC Distributors to sell prescription medications purchased from sources outside the legitimate wholesale market to MOMS Pharmacy, a division of Allion Healthcare (hereinafter Allion), which specialized in servicing HIV and AIDS patients.
To that end, Costa and Cruz met with the defendant, a licensed pharmacist, who agreed to communicate with his "contact" at Allion/MOMS Pharmacy—Glenn Schabel. Schabel served as the purchasing agent, corporate compliance officer, regional manager, and supervising pharmacist for Allion/MOMS Pharmacy, and was responsible for negotiating with and purchasing from secondary wholesalers and ensuring compliance with applicable laws and regulations. Following the meeting with Cruz and the defendant, Costa began receiving shipments of prescription medications from Cruz's suppliers, and after "cleaning" the medication bottles, Costa would send a list of available medications to the defendant. The defendant sent the list to Schabel, who put in a weekly purchase order. The defendant also advised Costa on "everything and anything that had to do with the business and the process."
Costa initially retained 3% of the proceeds of the sales to Allion/MOMS Pharmacy, and later kept 4 to 5% of the proceeds of the sales. The defendant was paid 5 to 7% of the proceeds of the sales, and in turn, the defendant paid Schabel, and later the defendant's friend, Harry Abolafia, whom the defendant brought in to the operation to help with "paperwork." After some time, SMC Distributors as well as other licensed wholesalers established by Costa were making sales to Allion/MOMS Pharmacy in the sum of $1.5 to $2 million per week.
This operation eventually came to the attention of the New York State Attorney General's Office, which obtained court orders for wiretaps on the defendant's and Costa's cell phones and proceeded to monitor calls between the defendant and Costa and the defendant and Schabel. On [*3]February 2, 2012, investigators from the Attorney General's Office executed a search warrant at MOMS Pharmacy headquarters and seized boxes of prescription medications delivered by Costa's wholesale companies. After the search warrant was executed, Allion/MOMS Pharmacy pulled all of its medications off the shelves in all of its locations, had them quarantined, and turned them over to the Attorney General's Office as evidence. Allion/MOMS Pharmacy then replenished its entire inventory with medications from AmerisourceBergen. Allion/MOMS Pharmacy, which in 2010 had been worth approximately $275 million, was later acquired by a nonprofit corporation for approximately $27 million.
In addition to the testimony of Costa and other witnesses, the People offered into evidence recordings of several phone calls that had been intercepted by the wiretaps. Supervising Investigator Aaron Sherer testified that when the subject calls were intercepted, three original recordings were made—two to "DVD-RAM drives" and one to a hard drive. It is undisputed that one set of recordings was sealed by the issuing judge in accordance with CPL 700.50(2). Prior to trial, Sherer created a composite disc of selected calls from the hard drive and compared the composite recording to the unsealed original version of the intercepted communications to ensure the accuracy of the composite recording. The defendant's objection to the admission of the composite recording on the ground that it was not sealed and had not been compared to the sealed original recording was denied, and numerous intercepted calls were played for the jury from the composite recording.
Upon the foregoing evidence, the jury convicted the defendant of grand larceny in the first degree, attempted grand larceny in the first degree, criminal diversion of prescription medications and prescriptions in the first degree, attempted criminal diversion of prescription medications and prescriptions in the first degree, conspiracy in the fourth degree, three counts of money laundering in the first degree, money laundering in the second degree, and commercial bribery in the first degree, and sentence was imposed. On appeal, the defendant argues, inter alia, that it was error to admit the composite recording of intercepted calls and that, with respect to all of the charges except commercial bribery in the first degree, the People failed to present legally sufficient evidence.
1. Admission of the Composite Recording of Intercepted Calls
After the United States Supreme Court struck down New York's eavesdropping statute as unconstitutional (see Berger v New York, 388 US 41, 43-44), the United States Congress passed the Omnibus Crime Control and Safe Streets Act of 1968 (Pub L 90-351, 82 US Stat 197; hereinafter the Act), setting forth "the minimum constitutional criteria for electronic surveillance" (People v Vespucci, 75 NY2d 434, 438 [internal quotation marks omitted]; see 18 USC § 2510 et seq.). In so doing, Congress recognized the gravity of the privacy interests at stake—that "[e]very spoken word relating to each [individual's] personal, marital, religious, political, or commercial concerns" could be intercepted—and, thus, the need for extraordinary and uniform protection with regard to electronic surveillance (S Rep 90-1097, 90th Cong, 2d Sess, reprinted in 1968 US Code Cong & Admin News at 2112, 2154; see Berger v New York, 388 US at 55-56). The federal law permitted the states to enact legislation governing such surveillance, as long as it conformed to the minimum requirements set forth under the Act (see 18 USC § 2516[2]; People v Vespucci, 75 NY2d at 438; People v Shapiro, 50 NY2d 747, 763-764). Thereafter, New York adopted what is now codified as Criminal Procedure Law article 700, governing eavesdropping and video surveillance warrants, which tracks the procedures set forth in federal law (see 18 USC § 2510 et seq.; CPL 700.05 et seq.; People v Sher, 38 NY2d 600, 604).
Under that article, the contents of communications intercepted pursuant to an eavesdropping warrant "must, if possible, be recorded" (CPL 700.35[3]), and immediately upon the expiration of the period of the warrant, the recordings "must be made available to the issuing justice and sealed under his [or her] directions" (CPL 700.50[2]). The recordings must be kept for 10 years (see CPL 700.55[2]). Recipients of a communication intercepted in accordance with CPL article 700 "may disclose the contents of that communication . . . while giving testimony under oath in any criminal proceeding in any court" (CPL 700.65[3]). However, "the presence of the seal" required by CPL 700.50(2), "or a satisfactory explanation of the absence thereof," is "a prerequisite for the use or [*4]disclosure of the contents of any communication" (CPL 700.65[3]).
In People v Nicoletti, the New York Court of Appeals held that the sealing requirement, which reduces the risk of editing or alteration of wiretap recordings, must be strictly construed (see 34 NY2d 249, 253; see also People v Winograd, 68 NY2d 383, 390; People v Sher, 38 NY2d at 605). It is the People's burden to demonstrate compliance with the statutory procedures, even absent any evidence of tampering with wiretap recordings (see People v Winograd, 68 NY2d at 390-391; People v Sher, 38 NY2d at 605). Indeed, the defendant has no burden to produce evidence that a recording has been altered (see People v Basilicato, 64 NY2d 103, 116; People v Nicoletti, 34 NY2d at 253). In the absence of compliance with the statutory procedures, intercepted communications and derivative evidence are inadmissible (see People v Schulz, 67 NY2d 144, 149; People v Sher, 38 NY2d at 604).
Relying on Nicoletti and its progeny, the defendant argues that the trial court erred in admitting the unsealed composite recording (see People v Basilicato, 64 NY2d 103; People v Washington, 46 NY2d 116; People v Sher, 38 NY2d 600; People v Glasser, 58 AD2d 448). However, in all of those cases, the People failed to comply with the sealing statute in that either the recordings had never been sealed (see People v Nicoletti, 34 NY2d at 253), there was a delay in sealing the recordings after expiration of the warrant (see People v Basilicato, 64 NY2d 103; People v Washington, 46 NY2d 116; People v Glasser, 58 AD2d 448), or the sealed recording was unsealed, without judicial authority or supervision, before the trial (see People v Sher, 38 NY2d 600). In the present case, in contrast, it is undisputed that an original set of recordings was sealed and preserved in accordance with the statute. The question is whether, in light of such compliance with the statute, it was error to admit a composite recording that was never sealed or compared to the sealed original. We hold that, whereas the composite recording was properly authenticated at trial (see generally People v Ely, 68 NY2d 520, 527-528), it was properly admitted.
There is nothing in the relevant statutory language that provides that only a sealed recording can be admitted into evidence at trial [FN1]. CPL 700.65(3) permits disclosure of the "contents" of intercepted communications and makes the presence of the seal a prerequisite to disclosure of "the contents" of the communication [FN2]. The statute does not specify that the contents of the communication must be disclosed in the form of a sealed recording or, indeed, in any particular form. Consistent with the statute, disclosure may, for example, take the form of testimony. Clearly, testimony could not be subject to any sealing requirement, yet a witness could testify to contents of a communication as long as a seal was present on the wiretap recordings. The same is true of a properly authenticated composite recording. As long as an original set of recordings was sealed and preserved in accordance with CPL 700.50(2) and the composite recording is otherwise authenticated in accordance with law, it is admissible.
The purpose of the sealing requirement is served under these circumstances. The sealing requirement and exclusionary rule set forth in CPL 700.50(2) and 700.65(3) were taken directly, and [*5]almost verbatim, from the federal statute (see 18 USC § 2518[8][a])[FN3]. The "safeguards" set out in that federal statutory provision were "designed to insure that accurate records will be kept of intercepted communications" (S Rep 90-1097, 90th Cong, 2d Sess, reprinted in 1968 US Code Cong & Admin News at 2193; see United States v Ojeda Rios, 495 US 257, 263; see also People v Sher, 38 NY2d at 604; People v Nicoletti, 34 NY2d at 253). In particular, the sealing of an original "limits [State Officials'] opportunity to alter the recordings" (United States v Ojeda Rios, 495 US at 263) and ensures that this insulated set of recordings is always available. Here, an original set of recordings was sealed and retained. The availability of that sealed set of recordings served both as a deterrent to law enforcement officials against altering or unfairly editing the data in creating a composite recording, and as a resource for the defendant, in the event he sought to challenge the content of the composite recording.
Moreover, there is no statutory requirement that a properly authenticated composite recording be compared against the sealed original recording. Three simultaneous original recordings of the intercepted communications were created in this case. The composite recording was compared against an original version of the recordings, and Sherer testified that the composite recording was a true and accurate reflection of the content of the original. Again, a sealed version of the original recording existed to deter alteration of, and permit challenge to, the composite, thus satisfying the statute.
Indeed, if a composite recording had to be compared to the sealed original version, that would require the sealed version to be unsealed, played and replayed as investigators checked for accuracy, and then resealed. Such a procedure would "disturb the sanctity of the originals" (People v Sher, 38 NY2d at 605), thus frustrating the statute's purpose of preserving accurate records of intercepted communications. The requirement that a sealed original be played at trial would have the same effect. Further impracticalities abound in such a requirement, as the sealed original recording may contain many more communications than the People seek to play for the jury. Moreover, as in the present case, a defendant may successfully move to have certain portions of communications the People seek to play for the jury redacted, which would create practical difficulties if the communications were played from the sealed original.
Significantly, federal courts interpreting the federal statute (see 18 USC § 2518[8][a]) have determined that it is permissible to introduce into evidence composite recordings, including those created from a recording that was never sealed, as long as an original set of recordings was sealed and preserved in accordance with the statute (see United States v Lnu, 575 F3d 298, 301-305 [3d Cir]; United States v Rivera, 153 F3d 809, 811-812 [7th Cir]; United States v Denton, 556 F2d 811 [*6][6th Cir]). These courts' interpretation of the federal eavesdropping statute is "instructive" in interpreting CPL article 700, since "that article reflects and follows controlling Federal law" (People v Madori, 153 AD2d 287, 295).
Accordingly, for all of the foregoing reasons, we reject the defendant's contention that the trial court erred in admitting into evidence the composite recording of intercepted communications.
2. Legal Sufficiency of the Evidence of Grand Larceny
The defendant challenges the legal sufficiency of the evidence underlying his convictions of grand larceny in the first degree and attempted grand larceny in the first degree. In examining the legal sufficiency of the evidence, this Court must determine "whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Bleakley, 69 NY2d 490, 495 [citation omitted]).
A person is guilty of grand larceny in the first degree when he or she steals property, the value of which exceeds $1 million (Penal Law § 155.42). "A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself [or herself] or to a third person, he [or she] wrongfully takes, obtains or withholds such property from an owner thereof" (Penal Law § 155.05[1]). As charged to the jury in the present case, "[a] person wrongfully takes, obtains or withholds property from an owner when that person makes a false representation of a past or existing fact while aware that such representation is false, and obtains possession and title to the property as a result of the owner's reliance upon such representation" (see Penal Law § 155.05[2][a]; People v Norman, 85 NY2d 609, 618-619). This is commonly known as larceny by false pretenses.
The People's theory in this case was that the defendant, acting in concert with Costa, Costa's wholesale companies, Schabel, and Abolafia, wrongfully took money from Allion/MOMS Pharmacy by falsely representing that the medications they were selling were lawful to sell, transfer, and dispense. The defendant argues, among other things, that the People failed to prove that such a false representation of past or existing fact was made to Allion/MOMS Pharmacy because Schabel, a high managerial employee of Allion/MOMS Pharmacy, knew that the medications were not lawful to sell, transfer, and dispense, and thus, Allion/MOMS Pharmacy, by imputation, also knew this fact. We agree.
When corporate agents act within the scope of their authority, "everything they know or do is imputed to their principals" (Kirschner v KPMG LLP, 15 NY3d 446, 466; see Center v Hampton Affiliates, 66 NY2d 782, 784; Restatement [Third] of Agency § 5.04, Comment b). Indeed, the principal is bound by knowledge acquired by an agent acting within the scope of his or her agency even if "the information is never actually communicated to it" (Center, 66 NY2d at 784), or if the agent "acts less than admirably, exhibits poor business judgment, or commits fraud" (Kirschner, 15 NY3d at 465). After all, "since corporations, which are legal fictions, can operate only through their designated agents and employees, the acts of the latter are, in a sense, the acts of the corporation as well" (People v Byrne, 77 NY2d 460, 465 [citation omitted]; see Great Minds v FedEx Off. & Print Servs., Inc., 886 F3d 91, 95 [2d Cir] ["The concept of an agency relationship is a sine qua non in the world of entities like corporations . . . , which have no concrete existence"]).
An exception to the rule of imputed knowledge—often referred to as the "adverse interest" exception—"occurs when the agent has abandoned his or her principal's interests and is acting entirely for his or her own or another's purposes" (Christopher S. v Douglaston Club, 275 AD2d 768, 770; see Kirschner, 15 NY3d at 466; Center, 66 NY2d at 784; Restatement [Third] of Agency § 5.04; Robert L. Haig, Commercial Litigation in New York State Courts § 85.46 [4th ed 4C West's NY Prac Series 2015]). In such circumstances, an agent's knowledge will not be imputed to the [*7]principal [FN4]. To come within the adverse interest exception, "the agent must have totally abandoned his [or her] principal's interests and be acting entirely for his [or her] own or another's purposes. It cannot be invoked merely because he [or she] has a conflict of interest or because he [or she] is not acting primarily for his [or her] principal" (Center, 66 NY2d at 784-785 [emphasis added]; see Kirschner, 15 NY3d at 466).
"This rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases—outright theft or looting or embezzlement—where the insider's misconduct benefits only himself [or herself] or a third party; i.e., where the fraud is committed against a corporation rather than on its behalf" (Kirschner, 15 NY3d at 466-467).
"A fraud that by its nature will benefit the corporation is not adverse to the corporation's interests, even if it was actually motivated by the agent's desire for personal gain" (id. at 467 [internal quotation marks omitted]).
Here, the evidence at trial revealed that, during the relevant time period, Schabel was the purchasing agent for Allion/MOMS Pharmacy. In that role, he was in charge of negotiating with and purchasing medications from wholesalers, including secondary wholesalers like Costa's corporations, and was not supervised in that capacity. He was also the corporate compliance officer and responsible for ensuring that Allion/MOMS Pharmacy was complying with laws and regulations. It is undisputed that, in the course of performing these duties, Schabel learned that the medications sold by Costa's companies were not lawful to sell, transfer, and dispense. The question is whether that knowledge nevertheless cannot be imputed to Allion/MOMS Pharmacy on the ground that Schabel was acting adversely to the corporation.
The adverse interest exception, as articulated in the case law, is very narrow, and it does not apply here [FN5]. Schabel's conduct of knowingly buying medications outside the legitimate stream of commerce benefitted both himself and Allion/MOMS Pharmacy (see id. ["[s]hould the agent act[ ] both for himself and for the principal, . . . application of the exception would be precluded" (internal quotation marks omitted)]). That conduct benefitted Schabel because he was receiving payment from the defendant. However, the conduct also benefitted Allion/MOMS Pharmacy since it acquired medications at a lower price than it would have paid on the legitimate market, thereby increasing its profits. The evidence established that Costa's companies were giving Allion/MOMS Pharmacy a discount of 6 to 6.5% off the wholesale price, and the best discount Allion/MOMS Pharmacy could otherwise obtain was 4 to 5% off the wholesale price. Indeed, the evidence demonstrated that, at one point after Schabel had started purchasing from Costa's companies, Schabel was instructed by corporate officers to purchase only from "the big three." After about one month of "track[ing] their numbers," however, the CEO and CFO of Allion asked to meet with Costa, to "get [him] back on board." Costa had prepared for potential questions from the CEO and CFO regarding the origins of the medications sold by his companies, but this proved unnecessary. At the [*8]meeting, the CEO and CFO never asked where the drugs came from.
The People argue that Schabel's knowledge is not properly imputed to Allion/MOMS Pharmacy because he actively undertook to conceal the illegitimate origins of the medications from the corporate officers. They cite to evidence that, in consultation with the defendant and Schabel, Costa had planned to tell the CEO and CFO of Allion during their meeting, which Schabel also attended, that his companies purchased medications from "the big three." The People also rely on evidence that, when problems with the medications purchased from Costa arose, Schabel did not report it to anyone, but simply requested a refund from Costa. However, as previously noted, an agent's knowledge is imputed to a corporation "although the information is never actually communicated to it" (Center, 66 NY2d at 784). The law presumes that an agent communicates knowledge within the scope of his or her agency to the principal, and that presumption "does not depend on a case-by-case assessment of whether this is likely to happen" (Kirschner, 15 NY3d at 466). Instead, the legal presumption "governs in every case, except where the corporation is actually the agent's intended victim" (id.). While an agent, engaged in a scheme to defraud his or her principal, "cannot be presumed to have disclosed that which would expose and defeat his [or her] fraudulent purpose" (Center, 66 NY2d at 784), "[w]here the agent is defrauding someone else on the corporation's behalf, the presumption of full communication remains in full force and effect" (Kirschner, 15 NY3d at 466).
Here, Allion/MOMS Pharmacy was not Schabel's intended victim, and although he was receiving payment beyond his employee salary for buying medications from Costa's companies, he was not engaged in a scheme to defraud Allion/MOMS Pharmacy. If Schabel committed fraud, he did so against the patients Allion/MOMS Pharmacy served (and their insurers), and he did so on behalf of both himself and the corporation. Whether or not such an act was authorized by officers or other agents of Allion/MOMS Pharmacy, the corporation acquired Schabel's knowledge and acted through him with respect to the purchase of these medications (see id. at 465 ["A corporation must . . . be responsible for the acts of its authorized agents even if particular acts were unauthorized"]).
The People also focus on the ultimate effect of Schabel's fraud on Allion/MOMS Pharmacy, i.e., that the corporation lost most of its value, positing that Allion/MOMS Pharmacy was thus a victim of Schabel's scheme to enrich himself. However, the Court of Appeals observed in Kirschner:
"any harm from the discovery of the fraud—rather than from the fraud itself—does not bear on whether the adverse interest exception applies. The disclosure of corporate fraud nearly always injures the corporation. If that harm could be taken into account, a corporation would be able to invoke the adverse interest exception and disclaim virtually every corporate fraud—even a fraud undertaken for the corporation's benefit—as soon as it was discovered and no longer helping the company" (id. at 469; see Restatement [Third] of Agency § 5.04, Comment c ["the fact that an action taken by an agent has unfavorable results for the principal does not establish that the agent acted adversely"]).
Thus, in Kirschner, the Court of Appeals rejected the argument that a corporate officer's fraud was adverse to the corporation merely on the basis that, upon discovery of the fraud, the corporation went bankrupt (see 15 NY3d at 468-469).
There are important reasons for imputing to a corporation the knowledge obtained and actions taken by authorized agents within the scope of their agency. "Imputation creates incentives for a principal to choose agents carefully" and to "use care in delegating functions to them," and encourages "a principal to develop effective procedures for the transmission of material facts, while discouraging practices that isolate the principal or coagents from facts known to an agent" (Restatement [Third] of Agency § 5.03, Comment b; see Kirschner, 15 NY3d at 466, 469). Essentially, "the presumption of imputation reflects the recognition that principals, rather than third parties, are best suited to police their chosen agents," and thus, most justifiably bear the risk of their misconduct (Kirschner, 15 NY3d at 468). To conclude here that Schabel's knowledge and conduct [*9]could not be imputed to Allion/MOMS Pharmacy would eliminate the benefits of this risk allocation and weaken the law of corporate liability.
Since Schabel's knowledge regarding the illegitimate source of the drugs is thus properly imputed to Allion/MOMS Pharmacy, the People failed to prove an essential element of the grand larceny counts, as charged to the jury—the making of a false representation on which Allion/MOMS Pharmacy relied. Accordingly, the convictions of grand larceny in the first degree and attempted grand larceny in the first degree must be reversed, and those counts of the indictment dismissed insofar as asserted against the defendant.
3. Legal Sufficiency of the Evidence of Criminal Diversion of Prescription Medications and Prescriptions
The defendant further challenges the legal sufficiency of the evidence underlying the convictions of criminal diversion of prescription medications and prescriptions in the first degree and attempted criminal diversion of prescription medications and prescriptions in the first degree. A person is guilty of criminal diversion of prescription medications and prescriptions in the first degree when he or she commits a criminal diversion act and the value of the benefit exchanged is in excess of $50,000 (see Penal Law § 178.25). As charged to the jury in the present case, " [c]riminal diversion act' means an act or acts in which a person knowingly . . . transfers or delivers, in exchange for anything of pecuniary value, a prescription medication or device with knowledge or reasonable grounds to know that the recipient has no medical need for it" (Penal Law § 178.00[3][a]).
The People's theory was that the defendant, acting in concert with Costa, Costa's wholesale drug companies, and Abolafia, knowingly sold to Allion/MOMS Pharmacy prescription medications for which, because the medications were adulterated, the company had no medical need [FN6]. The defendant does not challenge the People's premises that (1) the medications had left the legitimate stream of commerce rendered them "adulterated," and (2) one cannot have a "medical need" for adulterated medications, as the term "medical need" is used in the statute. Thus, we do not address the validity of these premises. However, the defendant challenges the applicability of this statute to his alleged conduct on the basis that, by its terms, the statute cannot apply to a transfer of prescription medications to a corporation, as opposed to a person capable of having medical needs. Again, we agree.
Article 178 of the Penal Law, setting forth the offense of criminal diversion of prescription medications and prescriptions, was added to the Penal Law in 1995 (see L 1995, ch 81, § 94) as part of a budget bill aimed at reforming the Medicaid and "Welfare systems" to control spending in those areas (Governor's Mem approving L 1995, ch 81, 1995 McKinney's Session Laws of NY at 2299; see William C. Donnino, Practice Commentary, McKinney's Cons Laws of NY, Penal Law § 178.00). As it pertained to the enactment of article 178, the bill sought to realize savings "through efforts to do away with fraud in the Medicaid Program," specifically by "assist[ing] prosecutors in tracking down and convicting persons who [were] illegally selling prescription drugs" (Governor's Mem approving L 1995, ch 81, 1995 McKinney's Session Laws of NY at 2300).
Although there are very few reported cases applying article 178 since its enactment 20 years ago, the statutory objective has been pursued in those cases by prosecuting individuals who sold prescription drugs to another individual on the street (see People v DuBois, 35 Misc 3d 1230[A], 2012 NY Slip OP 50960[U] [Crim Ct, NY County]; People v Polanco, 24 Misc 3d 406 [Crim Ct, NY County]; People v Ross, 12 Misc 3d 755 [Crim Ct, Kings County]) or bought prescription drugs from a person not authorized to sell them (see People v Barnes, 117 AD3d 1203; People v Medinas, [*10]180 Misc 2d 251 [Sup Ct, Kings County])[FN7]. Under the plain language of the statute, it is this conduct by these individuals—the patient who sells his or her medication on the street to someone who intends to resell it, or the person who buys that medication from the patient—that is covered by the statute. The defendant was not a patient selling his medication on the street. The defendant brokered transactions between Costa's wholesale drug companies and Allion/MOMS Pharmacy, and consulted with Costa on various matters in furtherance of the scheme. He was charged with acting in concert to sell prescription medications to a corporation, which, as the defendant points out, does not merely lack a medical need for the medications that were sold, but is incapable of having medical needs at all.
The People posit that Allion/MOMS Pharmacy can be considered to have a "medical need" because that term includes "maintaining the health of its patients through education, counseling, and medications." This interpretation of the term "medical need" expands its meaning beyond reasonable statutory interpretation and into the realm of legislating.
To read the statute to cover the charged conduct, the term "recipient" could be interpreted to mean "ultimate recipient," meaning, in this case, the patients buying the drugs from Allion/MOMS Pharmacy. However, reading the word "ultimate" into the statute would, again, engage the Court in "legislat[ing] under the guise of interpretation" (People v Finnegan, 85 NY2d 53, 58). Moreover, the use of the terms "transfers and delivers" in the statutory definition of "criminal diversion act" informs the use of the term "recipient" and suggests a direct relationship between transferor and recipient. Construing "recipient" to mean "ultimate recipient" could potentially exclude from the scope of the statute the classic case of criminal diversion—typified by the cases cited above—in which medications are sold to a reseller, since, in those cases, the medications are arguably being resold to a person who has a medical need for them.
In sum, since the statutory definition of "criminal diversion act" requires that the recipient of the subject drugs lack a "medical need" for them, the statute cannot be read to criminalize the charged conduct of brokering sales of prescription drugs to a pharmacy. "This statutory infirmity cannot be overlooked, nor can it be remedied through statutory interpretation" (People v Boothe, 16 NY3d 195, 198). "If [the] deficiency is to be corrected, it must be done through legislative action, as the Legislature is better equipped to correct any deficiencies that might exist" (id. at 198; see generally People v Golo, 26 NY3d 358, 362 ["[W]e are guided [b]y the plain text of the statute. If the wording of the statute has caused an unintended consequence, it is up to the legislature to correct it" (internal quotation marks and citation omitted)]). Indeed, in recent years, there have been several unsuccessful attempts to amend article 178 of the Penal Law (see e.g. 2015-2016 NY Senate Bill S5396; 2013-2014 NY Senate Bill S2942; 2011-2012 NY Assembly Bill A7251; 2009 NY Assembly Bill A6584). The legislative history of these bills recognizes the "exploding blackmarket in non-controlled substance prescription medications," including HIV/AIDS medications, and the fact that "[c]urrent law does not contemplate a large-scale illegal market of these drugs" (Sponsor's Mem in Support of 2015-2016 NY Senate Bill S5396). The proposed legislation was meant to "address this by increasing, or establishing, criminal penalties that better fit these crimes" (id.).
Since we decline to expand the coverage of the existing statute beyond conduct to which it manifestly applies, the convictions of criminal diversion of prescription medications and prescriptions in the first degree and attempted criminal diversion of prescription medications and prescriptions in the first degree must be reversed and those counts of the indictment dismissed [*11]insofar as asserted against the defendant. The conviction of conspiracy in the fourth degree, based on conspiracy to commit criminal diversion of prescription medications and prescriptions, must also be reversed and that count dismissed insofar as asserted against the defendant. While this result may seem unsatisfactory as a matter of policy, it is the function of the Legislature, not this Court, to revise article 178 in a manner that will result in more effective and comprehensive treatment of the increasingly pervasive problem of black-market sales of prescription medications.
4. Money Laundering Convictions
The defendant was convicted of three counts of money laundering in the first degree and one count of money laundering in the second degree. The first-degree counts, as charged to the jury, required a finding that the defendant knowingly conducted one or more financial transactions involving the proceeds of a class B or class C felony (see Penal Law § 470.20[1][b][ii][A]). The jury was further instructed that grand larceny in the first degree is a class B felony and criminal diversion of prescription medications and prescriptions in the first degree is a class C felony. Since the People did not present legally sufficient evidence of either of these class B or class C felonies, the evidence was also legally insufficient to support the first-degree money laundering convictions.
The defendant was also convicted of money laundering in the second degree, which, as charged to the jury, was predicated upon the defendant's involvement in financial transactions representing the proceeds of the following specified criminal conduct—either grand larceny in the first degree, criminal diversion of prescription medications and prescriptions in the first degree, or commercial bribery in the first degree (see Penal Law 470.15[1][b][i][A]). Since the defendant has not challenged his conviction of commercial bribery in the first degree, this money laundering count does not logically fall as a result of the dismissal of the charges of grand larceny and criminal diversion of prescription medications and prescriptions. Further, the only argument the defendant makes as to the legal insufficiency of the evidence supporting the money laundering counts is that the People failed to prove that the defendant's financial transactions were designed to conceal the nature or location of the proceeds. Since such concealment was not an element of the second-degree money laundering count as charged to the jury (see Penal Law 470.15[1][b][i][A]), the defendant's legal sufficiency argument is inapplicable to that count. Therefore, there is no basis for disturbing the conviction of money laundering in the second degree.
5. Excessive Sentence
Contrary to the defendant's contention, the sentences imposed upon the convictions of commercial bribery in the first degree and money laundering in the second degree were not excessive (see People v Suitte, 90 AD2d 80).
Accordingly, the judgment is modified, on the law, by vacating the convictions of grand larceny in the first degree, attempted grand larceny in the first degree, criminal diversion of prescription medications and prescriptions in the first degree, attempted criminal diversion of prescription medications and prescriptions in the first degree, conspiracy in the fourth degree, and money laundering in the first degree (three counts), vacating the sentences imposed thereon, and dismissing those counts of the indictment insofar as asserted against the defendant; as so modified, the judgment is affirmed.
MASTRO, J.P., CHAMBERS and MALTESE, JJ., concur.
ORDERED that the judgment is modified, on the law, by vacating the convictions of grand larceny in the first degree, attempted grand larceny in the first degree, criminal diversion of prescription medications and prescriptions in the first degree, attempted criminal diversion of prescription medications and prescriptions in the first degree, conspiracy in the fourth degree, and money laundering in the first degree (three counts), vacating the sentences imposed thereon, and dismissing those counts of the indictment insofar as asserted against the defendant; as so modified, the judgment is affirmed.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1:Contrary to the defendant's contention, CPL 700.55(2), which provides that "[d]uplicate recordings may be made for use or disclosure . . . for investigations," merely permits such creation, use, and disclosure of duplicate recordings for investigations. It does not limit the creation, use, or disclosure of duplicate recordings to that purpose.

Footnote 2: "The term contents,' when used with respect to a communication, includes any information concerning the identity of the parties to such communications, and the existence, substance, purport, or meaning of that communication" (CPL 700.05[3]).

Footnote 3: 18 USC § 2518(8)(a) provides, in relevant part:
"The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. . . . Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his [or her] directions. . . . The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517."
Subsection (3) of section 2517 permits recipients of information concerning intercepted communications to disclose the contents of the communication while giving testimony under oath.

Footnote 4:While such circumstances are often cast as an exception to the rule of imputation, it has also been posited that when agents abandon their principal's interests and act "for [their] own exclusive benefit," they "cease[ ] to act within the scope of [their] employment and to that extent cease[ ] to act as agent[s]" (Henry v Allen, 151 NY 1, 11). So conceptualized, the rule of imputation simply would not apply (see id. at 11-12).

Footnote 5: Alternatively conceived, because Schabel did not abandon his principal's interest and act exclusively for his own benefit, he did not cease to act within the scope of his employment, and to that extent, cease to act as an agent.

Footnote 6: It is noted that Education Law § 6811 makes it a misdemeanor to "sell, deliver for sale, hold for sale or offer for sale . . . any drug . . . that is adulterated" (Education Law § 6811[9]).

Footnote 7: In addition to the definition of "criminal diversion act" as charged to the jury in this case, article 178 alternatively defines that term to include "receiv[ing], in exchange for anything of pecuniary value, a prescription medication or device with knowledge or reasonable grounds to know that the seller or transferor was not authorized by law to sell or transfer [it]" (Penal Law § 178.00[3][b]).